## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MOHAMMAD AHMAD GHULAM RABBANI,**

*Petitioner/Plaintiff,*

v.

**BARACK H. OBAMA, et al.,**

*Respondents/Defendants.*

Civ. No. 05-1607 (RCL)

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S APPLICATION FOR PRELIMINARY INJUNCTION

**JON B. EISENBERG** (CA State Bar #88278)
1970 Broadway, Suite 1200
Oakland, CA 94612
(510) 452-2581

**REPRIEVE**
Clive Stafford Smith (LA Bar #14444)
Cori Crider (NY Bar #4525721)
Alka Pradhan (D.C. Bar #1004387)
P.O. Box 72054
London EC3P 3BZ
United Kingdom
011 44 207 553 8140

**LEWIS BAACH PLLC**
Eric L. Lewis (D.C. Bar #394643)
Elizabeth L. Marvin (D.C. Bar #496571)
1899 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20006
(202) 833-8900

Dated:  March 27, 2014

*Counsel for Petitioner/Plaintiff*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITES ..................................................................................... iii

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

A.  The Reality of Force-Feeding at Guantánamo Bay ............................................ 3

B.  The Written Protocols on Force-Feeding at Guantánamo Bay ........................... 15

C.  Deprivation of Communal Prayer During Ramadan ......................................... 18

STATEMENT OF JURISDICTION ......................................................................... 19

ARGUMENT ....................................................................................................... 20

I.   THIS COURT SHOULD ENJOIN PETITIONER'S FORCE-FEEDING
     BECAUSE, GIVEN THE AVAILABILITY OF READY ALTERNATIVES, IT
     IS NOT REASONABLY RELATED TO LEGITIMATE PENOLOGICAL
     INTERESTS AND IS THEREFORE UNCONSTITUTIONAL ..................................... 20

     A.  The standard for determining the legality of the Guantánamo Bay force-
         feeding practices and protocols—whether they are "reasonably related to
         legitimate penological interests"—asks whether there are any "ready
         alternatives." ......................................................................................... 21

     B.  Force-feeding is an invasive and painful procedure which is inhumane,
         degrading, and a violation of international law and medical ethics .................... 22

     C.  The Guantánamo Bay force-feeding practices and protocols are
         unreasonable because they inflict unnecessary pain and suffering .................... 28

     D.  The Guantánamo Bay force-feeding practices and protocols are
         unreasonable because they subject detainees to force-feeding before the
         detainees are at risk of death or great bodily injury .................................... 28

     E.  The Guantánamo Bay force-feeding practices and protocols are
         unreasonable because "ready alternatives," as exemplified by U.S. Bureau
         of Prisons regulations, can achieve the government's legitimate interests ........... 32

F.	The Government has such complete control over the Guantánamo Bay detainees that hunger-strikers present no threat to institutional security ............... 34

G.	Even if the force-feeding protocols were to be upheld, this Court should grant habeas relief because, in practice, the Government is deviating from those protocols ........................................................................................................ 35

II.	DEPRIVATION OF COMMUNAL PRAYER VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT (RFRA) .................................................................. 35

III.	PETITIONER MUST BE AFFORDED THE PROTECTIONS OF INTERNATIONAL LAW PURSUANT TO THE TREATY OF FRIENDSHIP AND COMMERCE BETWEEN THE UNITED STATES AND PAKISTAN ............... 38

IV.	PETITIONER MEETS THE CRITERIA FOR GRANTING A PRELIMINARY INJUNCTION ........................................................................................................ 40

CONCLUSION ........................................................................................................ 41

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) .................................................................................. *passim*

*Al-Adahi v. Obama*,
   596 F. Supp. 2d 111 (D.D.C. 2009) .......................................................................................21

*Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
   729 F.3d 937 (9th Cir. 2013) ..................................................................................................25

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ................................................................................................................22

*Bezio v. Dorsey*,
   989 N.E.2d 942 (N.Y. 2013) ............................................................................................21, 31

*Bluman v. FEC*,
   800 F. Supp. 2d 281 (D.D.C. 2011) ......................................................................................36

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ....................................................................................................36, 37, 38

*Creek v. Stone*,
   379 F.2d 106 (D.C. Cir. 1967) ...............................................................................................19

*Cruzan v. Director, Mo. Dep't of Health*,
   497 U.S. 261 (1990) ................................................................................................................21

*Fed. Election Comm'n v. Wis. Right to Life, Inc.*,
   551 U.S. 449 (2007) ................................................................................................................37

*Hicks v. Bush*,
   452 F. Supp. 2d 88 (D.D.C. 2006) .........................................................................................21

*Hudson v. Hardy*,
   424 F.2d 854 (D.C. Cir. 1970) ...............................................................................................19

*Makin v. Colorado Department of Corrections*,
   183 F.3d 1205 (10th Cir. 1999) .............................................................................................36

*Miller v. Overholser*,
   206 F.2d 415 (D.C. Cir. 1953) ...............................................................................................19

*Rasul v. Myers*,
   563 F.3d 527 (D.C. Cir. 2009) ......................................................................36, 37

*Salahuddin v. Coughlin*,
   993 F.2d 306 (2d Cir. 1993)...............................................................................36

*Sebelius v. Hobby Lobby Stores, Inc.*,
   No. 13-354, *cert. granted*, 134 S. Ct. 678 (Nov. 26, 2013) ...................................36

*Turkmen v. Ashcroft*,
   915 F. Supp. 2d 314 (E.D.N.Y. 2013) ............................................................37, 38

*Turner v. Safley*,
   482 U.S. 78 (1987)........................................................................... *passim*

*United States v. Wilson*,
   471 F.2d 1072 (D.C. Cir. 1972) .........................................................................19

*Washington v. Harper*,
   494 U.S. 210 (1990)................................................................................20, 21, 22

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................................40

## FEDERAL STATUTES

42 U.S.C. § 2000bb-1 .................................................................................................35

## FEDERAL REGULATIONS

28 C.F.R. § 549.65(a)................................................................................................32

28 C.F.R. § 549.65(c)................................................................................................33

28 C.F.R. § 552.20 ....................................................................................................32

28 C.F.R. § 552.22(c)............................................................................................32, 33

28 C.F.R. § 552.22(c)(h)(2) ......................................................................................32

28 C.F.R. § 552.24 ....................................................................................................33

## PUBLIC LAWS

Pub. L. 109-366, § 5(a), 120 Stat. 2600 (2006) .........................................................39

iv

## INTERNATIONAL CASES

*Nevmerzhitsky v. Ukraine*, App. No. 548255/00,  Final Judgment, ¶ 98, Oct. 12, 2005
(Eur. Ct. H.R.) *available at* http://www.rwi.uzh.ch/lehreforschung/alphabetisch/
kiener/Vorlesungen/hs11-1/menschenrechte/unterlagen/
CASE_OF_NEVMERZHITSKY_v_UKRAINE.pdf ......................................................23, 24

*Prosecutor v. Šešelj*, Case No. IT-03-67-T, Urgent Order to the Dutch Authorities
Regarding Health and Welfare of the Accused 6 (Int'l Crim. Trib. for the Former
Yugoslavia Dec. 6, 2006).......................................................................................24

## TREATIES

Treaty of Friendship and Commerce Between the United States of America and Pakistan,
art. III, 12 U.S.T. 110, 404 U.N.T.S. 259 (Feb. 12, 1961),
*available at* http://tcc.export.gov/trade_agreements/all_trade_agreements/
exp_005355.asp ........................................................................................................39

Geneva Convention Relative to the Treatment of Prisoners of War Art. 3, Aug. 12, 1949,
75 U.N.T.S. 135, *available at* http://www1.umn.edu/humanrts/instree/y3gctpw.htm ............24

## UNITED NATIONS DOCUMENTS

U.N.H.R. Press Release, *OHCHR, IACHR, UN Working Group on Arbitrary Detention,
UN Rapporteur on Torture, UN Rapporteur on Human Rights and Counter-
Terrorism, and UN Rapporteur on Health reiterate need to end the indefinite
detention of individuals at Guantánamo Naval Base in light of current human rights
crisis* (May 1, 2013), *available at* www.ohchr.org/en/newsevents/
pages/isplaynews.aspx?newsid=13278&langl.......................................................22

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment, Dec. 10, 1984, 1465 U.N.T.S. 85, 113 U.N. Doc. A/39/51, *available at*
http://www1.umn.edu/humanrts/instree/h2catoc.htm.......................................................23

## EXECUTIVE ORDERS

*Executive Order, Ensuring Lawful Interrogations*, 13491, §3(a) (Jan. 22, 2009),
*available at* http://www.whitehouse.gov/the-press-office/ ensuring-lawful-
interrogations ........................................................................................................27

## TRANSCRIPTS

*The Tokyo War Crimes Trial*, vol. 6, *Transcript of the Proceedings in
Open Session* (1981) ........................................................................................10, 11

# OTHER AUTHORITIES

American Gastroenterological Association, *American Gastroenterological Association Medical Position Statement:  Guidelines for the Use of Enteral Nutrition* (1994) .................9

George J. Annas, Sondra S. Crosby & Leonard H. Glanz, *Guantánamo Bay: A Medical Ethics-free Zone?*  369 New Eng. J. Med. 101 (July 11, 2013) ......................24, 25

Michael L. Gross, *Force-Feeding, Autonomy, and the Public Interest*, New Eng. J. Med., 103 (July 11, 2013) ...........................................................................24, 26

Institute on Medicine as a Profession and Open Society Forum, Task Force Report, *Ethics Abandoned: Medical Professionalism and Detainee Abuse in the War on Terror* (2013) ...........................................................................................................................27

Mohamed Haq Magid, *Reflections on the Qur'an:  A Ramadan Reader* (2011) .........................18

Darius Rejali, *Torture and Democracy* (2007) ............................................................................10

George Ryley Scott, *The History of Torture* (1940) ...................................................................10

M. Stroud, H. Duncan & J. Nightingale, *Guidelines for enteral feeding in adult hospital patients*, 52 Gut vii1, § 3.0 (2003) *available at* http://gut.bmj.com/content/52/suppl_7/vii1.full#sec-3.............................................................6

Marc Thiessen, *Courting Disaster* (2009) ..................................................................................11

# MISCELLANEOUS

Moath al-Alwi, *A letter from Guantanamo:  "Nobody can truly understand how we suffer"* (Mar. 13, 2014) *available at* http://www.aljazeera.com/indepth/opinion/2014/03/letter-from-guantanamo-nobody-c-201431385642747154.html .................................9

American Ass'n of Critical-Care Nurses, *AACN Practice Alert:  Verification of Feeding Tube Placement* 2 (2009), *available at* http://www.aacn.org/WD/Practice/Docs/PracticeAlerts/Verification_of_Feeding_Tube_Placement_05-2005.pdf..................................8

Joanna Briggs Institute, *Methods for determining the correct nasogastric tube placement after insertion in adults*,  14(1) Best Practice 2 (2010), *available at* http://connect.jbiconnectplus.org/ViewSourceFile.aspx?0=5384 ........................................7, 8

Cal. Corr. Health Care Servs., *Inmate Medical Services Policies & Procedures*, Vol. 4, Ch. 22.2, Policy 4.22.2:  Mass Organized Hunger Strike (Sept. 29, 2011, rev. July 2013) § VII.C, at 5 *available at* http://www.cphcs.ca.gov/docs/imspp/IMSPP-v04-ch22.2.pdf.........................................29, 30

Congressional Research Service, *U.N. Convention Against Torture (CAT):  Overview and Application to Interrogation Techniques* (Jan. 26, 2009) *available at* http://www.fas.org/sgp/crs/intel/RL32438.pdf ...................................................................27

The Constitution Project, *Report of the Task Force on Detainee Treatment* (2013) *available at* http://detaineetaskforce.org/read/files/assets/ basic-html/index.html#page1 ...................................................................26

*Guantánamo:  hunger strikes and a doctor's duty*, The Lancet (May 4, 2013),  *available at* http://www.thelancet.com/journals/lancet/article/ PIIS0140-6736(13)60962-9/fulltext...................................................................23

*Guidelines for enteral feeding in adult hospital patients* at § 10.4, *available at* www.http://gut.bmj.com/content/52/suppl_7/vii1.full ...................................................................11

Int'l Comm. of the Red Cross, *Hunger strikes in prisons:  the ICRC's position* (Jan. 31, 2013) *available at* http://www.icrc.org/eng/resources/documents/faq/ hunger-strike-icrc-position.htm ...................................................................23

International Covenant on Civil & Political Rights, Art. 18, para. 1 (1976) *available at* http://www.refworld.org/pdfid/3ae6b3aa0.pdf ...................................................................39

Letter from Dianne Feinstein, Senator, to Honorable Chuck Hagel, Sec'y of Def. (June 19, 2013), *available at* http://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=8af43b52-0301-42b9-8f72-27f88997bd39 ...................................................................26

Letter from Jeremy A. Lazarus, M.D., President of Am. Med. Ass'n, to Honorable Chuck Hagel, Sec'y of Def. (Apr. 25, 2013) *available at* http://www.jhsph.edu/research/ centers-and-institutes/center-for-public-health-and-human-rights/_pdf/AMA%20Hunger%20Strikes%20Letter.pdf...................................................................23

Ian Lovett, *Inmates End Hunger Strike in California*, N.Y. Times (Sept. 5, 2013) *available at* http://www.nytimes.com/2013/09/06/us/ inmates-end-hunger-strike-in-california.html?_r=0 ...................................................................28, 32

David McFadden, *U.S. Military says number of Guantánamo prisoners on hunger strike has dropped to 75 from 106*, StarTribune, (July 18, 2013), *available at* http://www.startribune.com/politics/national/216036341.html...................................................................19

Samir Naji al Hasan Moqbel, *Gitmo Is Killing Me*, N.Y. Times (Apr. 14, 2013) *available at* http://www.nytimes.com/2013/04/15/opinion/ hunger-striking-at-guantanamo-bay.html?_r=0 ...................................................................25

Pennsylvania Patient Safety Reporting Systems, Patient Safety Advisory, *Confirming Feeding Tube Placement: Old Habits Die Hard* 1 (2006), *available at* http://patientsafetyauthority.org/ADVISORIES/AdvisoryLibrary/2006/Dec3(4)/Pages /23.aspx. ...................................................................................................................7

Carol Rosenberg, *Guantánamo: 25 Captives Quit Hunger Strike Since Ramadan*, Miami Herald (July 14, 2013) *available at* http://www.miamiherald.com/ 2013/07/14/3499662/guantanamo-25-captives-quit-hunger.html ..........................................18

Charlie Savage, *15 Held at Guantánamo Are Said to Quit Hunger Strike*, N.Y. Times (July 14, 2013) *available at* http://www.nytimes.com/2013/07/15/us/ more-guantanamo-detainees-quit-hunger-strike.html .......................................................19

Eric Schmitt & Tim Golden, *Force-Feeding at Guantánamo Is Now Acknowledged*, New York Times (Feb. 22, 2006), *available at* http://www.nytimes.com/ 2006/02/22/international/middleeast/22gitmo.html?_r=0. ........................................................4

Dr. Sayyid M. Syeed, *The Meaning of Tarawih*, *available at* http://www.nrcat.org/interfaith-campaign-to-address-anti-muslim-sentiment/background/the-meaning-of-tarawih ......................................................18

U.S. Dep't of Justice, Program Statement No. P5562.05 (July 29, 2005) *available at* http://www.cbsnews.com/htdocs/pdf/BOP_FBI_hungerstrikepolicy.pdf ...........33

World Medical Association, *WMA Declaration of Malta on Hunger Strikers* (1991) *available at* http://www.wma.net/en/30publications/10policies/h31/ ..............................22, 24

World Medical Association, *WMA Declaration of Tokyo—Guidelines for Physicians Concerning Torture and other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment* (1975) *available at* http://www.wma.net/en/30publications/10policies/c18/...........................................................22

## INTRODUCTION

Petitioner Mohammad Ahmad Ghulam Rabbani (known as Ahmad Rabbank), by and through undersigned counsel, moves this Court for a preliminary injunction addressing (1) the unconstitutional and inhumane force-feeding of hunger-striking detainees at Guantánamo Bay, and (2) a denial of their right to religious free exercise.  Petitioner requests an expeditious hearing on this motion because of the extreme nature of the constitutional, ethical, and human rights violations that are presently occurring at Guantánamo Bay.

Force-feeding at Guantánamo Bay is a violent, painful, and degrading process that violates international law and medical ethics.  Perhaps most notably, as reflected in public statements by United States military personnel, the force-feeding process includes techniques that inflict gratuitous pain and suffering on the detainees, in an effort to coerce them to give up their peaceful protest.  These techniques include the following:

1. Using so-called Forcible Cell Extraction (FCE) teams of soldiers to take detainees to feeding sessions by force and violence, despite their lack of resistance;

2. Genital searches;

3. Use of an immobilizing restraint chair;

4. Force-feeding twice each day when medically unnecessary;

5. Pulling the 110-centimeter-long feeding tubes out after each feeding and then forcibly re-inserting them for the next feeding, instead of leaving tubes in place from feeding to feeding;

6. Using feeding tubes that are too thick for detainees' nasal passages;

7. Using an outdated and unreliable method to determine proper placement of the feeding tube;

8. Forcing fluids into detainees at excessive speed, which causes severe enteral pain;

9.      If a detainee vomits during the process, repeating the process immediately, with vomit still on the prisoner; and if a detainee defecates during the process, leaving him sitting under physical restraint in his own feces.

Fluids are sometimes forced through detainees' feeding tubes at such an extreme rate—nearly two-thirds of a gallon in as little as 20 minutes—as to constitute a form of the "Water Cure" torture, which dates back to the Middle Ages.

Medical professionals are complicit in the infliction of this unnecessary pain and suffering in the effort to coerce the detainees to stop hunger-striking. Medical judgments have been made subservient to military orders.

The Guantánamo Bay force-feeding practices and governing written protocols are unconstitutional, given the availability of ready alternatives, which are exemplified by standards followed by the U.S. Bureau of Prisons and California state prisons. The Guantánamo detainees are being unnecessarily force-fed well before they are actually at risk of death or great bodily injury, and during the force-feeding they are being unnecessarily subjected to unnecessary and illegal physical abuse.

Petitioner wishes to make clear that he is not seeking an injunction to permit him to continue his hunger strike until death. Rather, he is seeking a constitutional protocol that ensures he is not force-fed prematurely and is not subjected to methods of force-feeding that cause unnecessary pain and suffering.

Hunger-striking detainees have also been deprived of the ability to participate in communal prayer during the Islamic holy month of Ramadan. This happened in 2013, and absent this Court's intervention it will surely happen again this year, when Ramadan begins on approximately June 28.

The United States Court of Appeals for the District of Columbia Circuit recently held that challenges by Guantánamo Bay detainees to the conditions of their confinement properly sound in habeas corpus and thus are not barred by the Military Commissions Act of 2006. *Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014). This motion invokes this Court's habeas jurisdiction to take action to remedy the festering wound of human rights violations that the detention facility at Guantánamo Bay has become.

## STATEMENT OF FACTS

### A.      The Reality of Force-Feeding at Guantánamo Bay.

Petitioner is a Pakistani national whose family, including three children, still lives in Pakistan. After capture by U.S. forces and detention at the infamous Dark Prison Afghanistan, he was transferred to Guantánamo Bay in September 2004. *See* Declaration of Clive Stafford Smith ¶¶ 6,7 ("Stafford Smith Decl.").

Petitioner joined the widespread hunger strike in February 2013, and has been on a continuous strike since that time. Stafford Smith Decl. ¶¶ 8, 12, 14-15, 71, 73. He joined the peaceful protest because he believes that his continued detention at Guantánamo Bay, for nine years without charge or trial, is wrong. He also finds the conditions at Guantánamo Bay deplorable, from physical abuse, arbitrary punishments, and disrespect of his religion to JTF-GTMO's withholding of his legal materials. *Id.* ¶¶ 9-11.

Hunger striking has taken place at Guantánamo since 2005, when detainees first sought to bring the prison into compliance with the Geneva Conventions and peacefully protest their detention without charge or trial. In late 2005 and early 2006, JTF-GTMO decided to use punitive force-feeding measures on hunger strikers to coerce the end of the peaceful protest. This tactic was confirmed in a *New York Times* interview with General Bantz J. Craddock, who was

then in overall command of the armed forces at Guantánamo Bay.  General Craddock told the *New York Times* precisely what the detainees had been warned:  that new procedures had been adopted in an effort to end their hunger strike.  He candidly admitted that he and senior officials at the Department of Defense had decided to take measures intended to make hunger-striking at Guantánamo Bay "*less convenient*"—a not-very-subtle euphemism for *more painful*—saying he had reviewed the use of restraint chairs and other new techniques and had decided that these new techniques would convince the detainees that hunger-striking was not worth their while:   " 'Pretty soon it wasn't convenient, and they decided it wasn't worth it,' he said of the hunger strikers.  'A lot of the detainees said:  "I don't want to put up with this.  This is too much of a hassle." ' " Eric Schmitt & Tim Golden, *Force-Feeding at Guantánamo Is Now Acknowledged,* New York Times (Feb. 22, 2006), *available at* http://www.nytimes.com/ 2006/02/22/international/middleeast/22gitmo.html?_r=0.

Thus, the commanding officer for Guantánamo Bay publicly conceded that he had changed existing practices solely for the purpose of inflicting gratuitous pain and suffering in order to coerce detainees to call off their hunger strike, and the detainees were made to understand this.

Petitioner feels, ironically, that only the most physically violent protests from detainees, such as throwing urine or feces, elicit positive change from the JTF-GTMO authorities. Rather than engage in such acts, Petitioner instead chose to join the general hunger strike of 2013. Unfortunately, the widespread strike only inspired the JTF-GTMO authorities to add further violent measures to the force-feeding techniques, which continue to be used on the Petitioner and other hunger-striking detainees to this day. Stafford Smith Decl. ¶¶ 8, 16, 36, 46, 51, 65.  They include:

1.      *Forcible and violent removal of detainees to the force-feeding location.*  A FCE team uses force and violence to take detainees to the feeding location, causing them substantial pain.  The soldiers rush the detainee's cell, force him onto the concrete floor, shackle his hands painfully behind his back, shackle his legs, and then carry his body to where he will be force-fed. Petitioner reports that after each FCE event, he has had pain in his back for days. He now attempts to walk to the force-feedings, although this act is involuntary because he simply cannot withstand the intense pain cause by the FCE process. Regardless, he and other detainees continue to be FCE'd periodically for various transgressions, including the genital searches detailed below.   Stafford Smith Decl. ¶¶ 16, 18-30, 33. Petitioner also describes the FCE process as "second degree torture," as he witnesses other detainees being subjected to FCE violence each day with the knowledge that he will be have to endure the same pain if he does not comply by walking to his feeding.  *Id.* ¶ 17. *See also* Declaration of Clive Stafford Smith for Imad Abdullah Hassan ¶¶ 42, 43, 45, attached to this motion as Exhibit A ("Exh. A").[1]

2.      *Unnecessary and degrading genital searches.* If detainees refuse to walk to the force-feeding chairs, the FCE team performs manual searches of their genitals, an arbitrary punishment that is particularly degrading to Muslim men due to their religious beliefs. Stafford Smith Decl. ¶¶ 30-35. These so-called "Scrotum Searches" were previously used only for external detainee movements, not internal movements such as going to or returning from a force-feeding. When Petitioner was first subjected to a Scrotum Search following a force-feeding in January 2014, he protested and received an apology from the soldier performing the search. But

---

[1] Mr. Hassan has also filed an application for preliminary injunction, similar to the present application. *See Hassan v. Obama*, Civ. No. 04-cv-1194 (UNA), Doc. #1001, filed March 11, 2014.

in February, Petitioner's genitals were again searched on his way to a force-feeding. When he protested, an FCE team was called to violently extract him from his cell.  *Id.* ¶ 33.

3.      *Use of restraint chairs.*   Force-feeding now occurs in a specially-made restraint chair, with the detainee forcibly strapped down tightly at his hands, legs, waist, shoulders, and head. The detainees have dubbed this the "Torture Chair."  Stafford Smith Decl. ¶¶ 38, 39.  *See also* Exh. A ¶¶ 42, 43, 45.

4.      *Insistence on two force-feedings per day*. Although only one force-feeding per day is necessary to keep detainees alive—JTF-GTMO's stated purpose in force-feeding the detainees—they are unnecessarily subjected to the violent force-feeding procedures twice daily. Stafford Smith Decl. ¶¶ 12, 53, 70. Petitioner has pointed out to medical staff that his weight does not fluctuate when he is force-fed only once daily, and has requested once-daily feedings due to the pain and severe gas that force-feeding causes his stomach. His requests have been ignored. *Id.* at ¶ 53.

5.      *Insertion and withdrawal of feeding tubes twice each day.*   Instead of being left in place for extended periods of time (to avoid undue pain, infection and medical complications), feeding tubes are withdrawn after each feeding and are re-inserted for the next feeding, twice daily.  Exh. A ¶ 40.  This is a departure from customary medical practice, whereby feeding tubes are left in place from one feeding until the next.  Declaration of Steven H. Miles for Imad Abdullah Hassan ¶ 8(a), attached to this motion as Exhibit B ("Exh. B"), *available at* http://gut.bmj.com/content/52/suppl_7/vii1.full#sec-3;  *see* M. Stroud, H. Duncan & J. Nightingale, *Guidelines for enteral feeding in adult hospital patients*, 52 Gut vii1, § 3.0 (2003) (nasogastric tubes "should usually be changed every 4-6 weeks swapping them to the other nostril").  Routine removal and reinsertion of feeding tubes increases the risk that the tube will

go into the lungs where it, or inadvertently-administered feeding solution, could cause serious injury or death.  Exh. B ¶ 8(a).

6.      *Use of thicker feeding tubes.*  Unnecessarily thick feeding tubes are used.  Instead of the size 8 French feeding tube previously used in 2005, feeding tubes as thick as size 14 French are now used, which allows for much faster feeding.  Stafford Smith Decl. ¶ 41; Exh. A ¶ 41, 60, 92.  Size 14 French feeding tubes are generally used only when there is a need to remove contents from the stomach, which is not necessary except in persons with some neurologic conditions that impair gastric emptying or when the rate of feeding is excessively rapid.  Exh. B ¶ 8(b).

7.      *Use of unsound method to confirm placement of feeding tube.*  Guantánamo Bay staff use a dangerous and unreliable method called "auscultation" to verify feeding tube placement.  *See infra* at 17.  "Auscultation involves instilling air into the feeding tube with a syringe while using a stethoscope placed over the stomach to listen for rushing air.  However, this method cannot differentiate between tube placement in the stomach or the lung/bronchial tree."  Pennsylvania Patient Safety Reporting Systems, Patient Safety Advisory, *Confirming Feeding Tube Placement:  Old Habits Die Hard* 1 (2006), *available at* http://patientsafetyauthority.org/ADVISORIES/AdvisoryLibrary/2006/Dec3(4)/Pages/23.aspx. It is an antiquated procedure which in customary medical practice has been replaced by radiographic confirmation with a chest x-ray or by determining the pH of fluid aspirated from the feeding tube.  *Id.* at 2-3, 5.  With auscultation, misplacements of feeding tubes are frequent, and each occurrence of misplacement increases the risk for future misplacement.  *Id.* at 4; *accord,* Joanna Briggs Institute, *Methods for determining the correct nasogastric tube placement after insertion in adults,* 14(1) Best Practice 2 (2010), *available at* http://connect.jbiconnectplus.org/

ViewSourceFile.aspx?0=5384 ("auscultation is not a reliable method to differentiate gastric and respiratory placement"); American Ass'n of Critical-Care Nurses, *AACN Practice Alert: Verification of Feeding Tube Placement* 2 (Dec. 2009), *available at* http://www.aacn.org/WD/Practice/Docs/PracticeAlerts/Verification_of_Feeding_Tube_ Placement_05-2005.pdf ("[t]he auscultatory method is not reliable in distinguishing between respiratory and gastric placement").

8.    *Speed of force-feeding.*   JTF-GTMO force-feeds detainees an astonishing and medically unnecessary amount of liquid in very short periods of time.  Stafford Smith Decl. ¶ 49; *see also* Exh. A ¶ 50. The March 2013 written protocols for force-feeding at Guantánamo Bay prescribe 20 to 30 minutes per feeding.  *See infra* at 17.  Over time, the amount and speed of force-feeding has varied from detainee to detainee.  One detainee reports having been force-fed with quantities of nutrient and water totaling as much as 3,400 milliliters (ml) in a single force-feeding session.  Exh. A ¶ 48.  Another detainee recently reported that at each force-feeding session he currently receives as much as 1,100 ml of nutrient mixed with water, which may be followed by another 500 ml of water mixed with anti-constipation medication, which may then be followed by another draught of water bringing the total to nearly 2,300 ml—taking roughly 20 minutes and rarely more than 30 minutes.  *Id.* ¶ 49.  This report is consistent with the governing protocols at Guantánamo, which prescribe about 2,300 ml for average-sized detainees.  *See infra* at 17.  Petitioner reports being force-fed around 1,000 ml of nutrient mixed with water, beyond which he may be given more liquid to wash through the feed and yet more liquid with laxative medication.  *See* Stafford Smith Decl. ¶¶ 54-55.

Thus, twice each day, as much as 2,300 ml of liquid (or more)—nearly two-thirds of a gallon (or more)—may be forced into a detainee in as little as 20 minutes.  This is an

extraordinary departure from customary medical practice.  Exh. B ¶ 8(d); Declaration of Stephen N. Xenakis M.D. for Imad Abdullah Hassan ¶ 12, attached to this motion as Exhibit C ("Exh. C").  Guidelines promulgated by the American Gastroenterological Association (AGA) for nasogastric tube feeding describe typical "rapid bolus" feeding at a rate of 250 ml of nutrient with 10 ml of water per 15 minutes.  *See* AGA, *American Gastroenterological Association Medical Position Statement:  Guidelines for the Use of Enteral Nutrition* 17 (1994), *available at* http://www3.us.elsevierhealth.com/gastro/policy/v108n4p1280.html. The Guantánamo Bay detainees may be force-fed at speeds nearly *seven times* this rate.

Petitioner has reported that during some of his force-feedings, the JTF-GTMO staff, and sometimes the nurses themselves, squeeze the liquid feed bags to increase the speed at which the liquid enters his stomach.  This causes immense pain as his stomach expands much more rapidly than is natural. Stafford Smith Decl. ¶ 46. If a detainee vomits at any time during or after a feeding, the process, including re-insertion of the nasal tube, is repeated. No matter how much liquid is expelled during vomiting, a full two cans of nutritional supplement is pumped back into the detainee's stomach. *Id.* at ¶¶ 48, 51.

Another hunger-striking detainee has further reported that frequently the guards "lie me down on my stomach in my cell and press my back forcefully, squeezing out any remaining feeding solution from the previous force-feeding session."  Moath al-Alwi, *A letter from Guantanamo: "Nobody can truly understand how we suffer"* (Mar. 13, 2014), *available at* www.aljazeera.com/indepth/opinion/2014/03/letter-from-guantanamo-nobody-c-201431385642747154.html.

This rapid infusion of high volumes of liquid into the stomach inevitably produces intense pain by distending the intestines.  It also increases the risk that stomach contents will be

regurgitated into the lungs.  Exh. B ¶ 8(d); Exh. C ¶ 12.  The speed-up of the force-feeding process amounts to "pumping," a form of the "Water Cure" torture, which has been practiced since the Middle Ages.  Exh. B ¶ 8(d).  "Pumping" featured prominently in the Spanish Inquisition and has historically been considered "one of the most fearful tortures."  Darius Rejali, *Torture and Democracy* 279-80 (2007).  It is performed by forcing copious amounts of water into the stomach and intestines.  *Id.* at 279.[2]  "[O]nce water is forced into the intestines in this manner, the organs stretch and convulse, causing 'some of the most intense pain that visceral tissues can experience.'  Victims feel their organs are being burned or cut on the inside."  *Id.* (quoting Edward Peters, *Torture* 167 (2d ed. 1996)).[3]

More recently, water torture by "pumping" was used by the Imperial Japanese Army against U.S. and allied prisoners of war during World War II, in ways very similar to what is now happening at Guantánamo Bay.  *See e.g., The Tokyo War Crimes Trial*, vol. 6, *Transcript of the Proceedings in Open Session* (1981) at 13,342 ("When the stomach was filled with water, the Kempei Tai put a wooden board on the stomach and then pressed or jumped on this"); 13,684 (Japanese soldier "stepped on my belly and tried to stamp so long that the water came out of my mouth"); 14,170 (prisoners "were given the water cure by having water forced into their stomachs and then were jumped on by the Japanese"); 15,339 ("a soldier held my head with one hand and with the other stopped my mouth—during this time a second soldier poured cold water

---

[2]  Water torture by "pumping" is to be distinguished from water torture by "choking"— sometimes called "waterboarding"—which prevents breathing.  *Torture and Democracy* at 279.

[3]  A graphic personal account of the Spanish Inquisition's torture of William Lithgow in 1620 describes how he was bound to a rack and pumped seven times—spaced a half-hour apart—with a half-gallon of water by means of a pot with an incised hole in its bottom that was held over his mouth, " 'whereupon my hunger-clunged belly waxing great, grew drum-like imbolstred, for it being a suffocating pain, in regard of my head hanging downward, and the water reingorging itself, in my tiiroat [sic], with a struggling force, it strangled and swallowed up my breath from yowling and groaning.' "  George Ryley Scott, *The History of Torture* 174-75 (1940).

from a teapot into my nostrils . . . .  This operation was repeated about fifteen times . . . .  I estimate that I must have had about 3 or 4 litres of water forced down me."); 15,372 ("A Kempei pressed against my belly to fill out my chest").

These sorts of practices are indisputably torture.  *See, e.g.,* Marc Thiessen, *Courting Disaster* 147 (2009) (arguing that CIA practices against detainees during Bush administration were not torture because "[n]o funnel was placed in their mouths, so that the water could fill their stomachs and distend their internal organs. . . .  No CIA interrogators jumped on the detainees' stomachs to revive them and make them vomit . . . .  [¶]  . . . these techniques practiced by the Japanese are clearly torture").

9.     *Forcing detainees to defecate on themselves.* Due to the speed at which the liquids are pumped into detainees' stomachs, they often must defecate while still in the feeding chair. Stafford Smith Decl. ¶¶ 49-50, 51, 56, 57. Petitioner has asked repeatedly for a chair with an attached toilet to avoid this degradation, but this concession has never been made despite his doctors agreeing that it was a medical necessity. *Id.* at 56.  Neither is he allowed to use the toilet in the force-feeding room, instead being forced to wait until he returns to his cell. He is therefore sometimes forced to defecate on himself. *Id.* at 57.  Force-feedings may also include doses of anti-constipation medications. This may cause detainees to defecate on themselves while still in the restraint chair, after which they are not given clean clothes.  Exh. A ¶¶ 46, 48. Some detainees feel that that this is perhaps the most humiliating part of the process.  *Id.* ¶ 46.  It also defeats the purpose of nasogastric feeding, which is to place nutrients in the intestines to be absorbed.  Exh. B ¶ 8(c); *see Guidelines for enteral feeding in adult hospital patients* at § 10.4, *available at* http://gut.bmj.com/content/52/suppl_7/vii1.full ("Whenever diarrhoea occurs with [enteral tube feeding], all laxatives must be stopped").

Petitioner has endured these abusive force-feeding procedures since February 2013.  He is taken from his cell twice daily to a room where he and other hunger strikers are strapped down to feeding chairs in eight places—around their hands and legs, two across their shoulders, one across their waists, and one across their heads.  Stafford Smith Decl. ¶ 39. The room contains five or six feeding chairs, and at the side of the room there is a foul-smelling toilet that causes Petitioner to become nauseated and feel the urge to vomit. *Id*. at 37.  If detainees make any attempt to resist the feeding, the FCE team will hold their heads still and squeeze their necks to completely immobilize them. *Id*. at 40.

A tube is then inserted through the detainees' noses into their stomachs. Stafford Smith Decl. ¶ 40. Petitioner and other detainees have endured this process undertaken by nurses and medical staff who lack the skill or knowledge to direct the tubes properly. On various occasions the metal-tipped tubes have been pressed into his organs and scraped the sides of his esophagus and stomach, and on at least one occasion soldiers rushed into the room at the sound of Petitioner's screams. He eventually fainted from the pain.  Regardless, requests to change the medical staff have been refused and Petitioner now suffers from throat and stomach infections resulting from the multiple and incorrectly-performed feedings. *Id*. at ¶¶ 40-46.

Petitioner continues to suffer terrible pain as a result of his abusive force-feeding, including severe stomach pain.  He has said that he often feels like smashing his head against the wall out of desperation from the pain. Stafford Smith Decl. ¶¶ 63, 65-66, 77. At various times as a result of his force-feeding, he has experienced double vision, coordination problems, and memory loss. He also vomits and coughs blood regularly.  *Id*. ¶¶ 13, 74.

Petitioner has also suffered at the hands of the FCE teams, being hit violently in the chest, having teeth knocked loose during extractions for force-feedings, and enduring degrading genital

searches, all as a result of his peaceful protest. Stafford Smith Decl. ¶¶ 30, 62, 64, 67. Before his hunger strike, Petitioner's weight was 167 pounds. In early March, he was weighed at between 109 and 110 pounds. *Id.* ¶ 13.

Most recently, after the mass hunger strike of 2013, new abuses have been heaped upon the hunger strikers. Exh. A ¶ 99. Some detainees who are willing to submit to force-feeding without physical resistance (including one who is wheelchair-bound) are nevertheless subjected to Forcible Cell Extractions. *Id.* ¶ 96, 97. If the detainee does not allow the FCE team to take him to the restraint chair "walking," he is denied recreation privileges. *Id.* ¶ 98. Detainees in Camp VI who go on hunger strike are punished by transfer to Camp V—the punishment camp for non-compliant detainees. There, they spend their first few days in Camp V Echo, where cells are constructed almost entirely of steel (including bed, floor, walls, ceiling and door) and are very cold, and what passes for a toilet is a hole in the ground, which is particularly difficult for the detainees to use in their weakened condition. *Id.* ¶¶ 100, 101, 102. Petitioner has been in Camp V Echo for months. He is forced to sleep on a steel slab despite doctors prescribing that he sleep with an isomat (a waterproof sheet), and endures severe back pain from the metal slab that prevents him from defecating normally. Even in this regard, Petitioner is degraded, as the hole in the floor does not have sufficient room for him to place his feet and squat, so he is forced to defecate in his own food container, the only other repository in the steel cell. Stafford Smith Decl. ¶¶ 65, 66.

The punitive nature of force-feeding at Guantanamo is underscored by the fact that even if Petitioner wanted to end his strike and the pain of force-feeding, he is not physically capable of doing so. During the summer of 2013, Petitioner was told that he must consume 3,000 calories per day in order to avoid force-feeding, with foods being assigned point values of 100 points =

1,000 calories: fruit was 5 points, milk was 20 points, pastry was 40 points, and one can of Ensure was 25 points. Stafford Smith Decl. ¶ 58. It is physically impossible for Petitioner, particularly in a weakened state from his hunger strike, suddenly to consume the amount of food that would constitute 3,000 calories in one day. Petitioner is still told that this is the only way for him to end force-feeding. *Id.*

Information is withheld from Petitioner regarding the contents of his feed bag. In addition to a nutritional supplement, Petitioner strongly suspects that medications or drugs are mixed into his feedings.  Immediately after feedings, in addition to the pain caused by feeding, Petitioner experiences memory loss and confusion, numbness, and hallucinations. Stafford Smith Decl. ¶ 71.  Other detainees have also stated that unidentified drugs are mixed into their feedings.  Exh. A ¶ 93.

Even some of the JTF-GTMO staff have expressed dismay at the detainees' abusive treatment.  In 2005, a doctor apologized to detainee Imad Abdullah Hassan for his pain and suffering.  This doctor said he was being ordered to participate in what he referred to as "the crime" of force-feeding, and that he would not participate if he had the choice. Exh. A ¶ 22. More recently, a sympathetic soldier told Hassan:  "I don't make the rules.  I am only a sergeant."  *Id.* ¶ 23. When Petitioner has sought help for the painful side effects of the force-feeding (severe stomach pain and gas among others), doctors at Guantánamo  have ridiculed him for being on hunger strike and one stated that he had no authority to do anything to help. As a result, Petitioner does not trust the doctors at Guantánamo and avoids seeing them even for his chronic pain and illnesses. Stafford Smith Decl. ¶ 28.

Such is the current state of affairs for hunger-striking detainees at Guantánamo Bay. Their treatment is not humane; it is horribly abusive.

**B.      The Written Protocols on Force-Feeding at Guantánamo Bay.**

As of March 5, 2013, force-feeding at Guantánamo Bay was governed by a 30-page set of publicly available protocols—also called "SOP," for "standard operating procedure." *See* Joint Task Force Guantánamo Bay, Cuba, Joint Medical Group, *Medical Management of Detainees on Hunger Strike* (Mar. 5, 2013) ("*Medical Management of Detainees*"), attached to this motion as Exhibit D ("Exh. D"). The March 2013 protocols pronounce a policy that when a hunger striker refuses sustenance, "medical procedures that are indicated to preserve health and life shall be implemented without consent from the detainee." *Id.* Exh. D, at 2. Those so-called "medical procedures" include the detainees' forcible nasogastric tube feeding under physical restraint.

According to the March 2013 protocols, force-feeding will be considered for a hunger-striker (a detainee who has missed nine consecutive meals or has had weight loss to a level less than 85% of Ideal Body Weight) under any of the following circumstances:  (1) "[t]here is evidence of deleterious health effects reflective of end organ involvement or damage . . . ," (2) "[t]here is a pre-existing co-morbidity that might readily predispose to end organ damage . . . ," (3) "[t]here is a prolonged period of hunger strike (more than 21 days)," (4) "[t]he detainee is at a weight less than 85% of the calculated Ideal Body Weight (IBW)," or (5) "[t]he detainee has experienced significant weight loss (greater than 15%) from previously recorded or in-processing weight." *Medical Management of Detainees*, Exh. D, at 2, 5.

The March 2013 protocols state that when force-feeding initially commences, it is *continuous*, starting at 20 milliliters-per-hour (ml/hr) and gradually increasing to 100 ml/hr after 96 hours. *Medical Management of Detainees*, Exh. D, at 15-16. Force-feeding is then transitioned to *intermittent*. *Id.* at 16. "Intermittent enteral feedings are usually done two times a day." *Id.* at 18. The detainee is shackled, a mask is placed over his mouth, and he "is escorted to

the chair restraint system and is appropriately restrained by the guard force." *Id.* "The feeding tube is passed via the nasal passage into the stomach," tube placement is confirmed by auscultation, "[t]he tube is secured to the nose with tape," and the feeding is typically completed "over 20 to 30 minutes," after which the feeding tube is removed. *Id.* The detainee may be kept in the restraint chair for two hours after the force-feeding is completed. *Id.*

The portions of the March 2013 protocols on intermittent force-feeding are somewhat opaque with regard to the quantity of liquid that is force-fed over 20 to 30 minutes, to the extent they merely state that "an appropriate quantity of the daily calories" is administered. *Medical Management of Detainees*, Exh. D, at 16. Nevertheless, a section of the protocols prescribing equations and calculations for determining quantities of nutrient and water indicates that a man of average weight (80 kilograms) may be force-fed 948 ml of nutrient (calculated on a basis of 35 Kcal per kilogram of weight) and 1,400 ml of water (calculated on a basis of 35 ml per kilogram of weight) twice daily. *Id.* at 20-21. Thus, the protocols indicate essentially the same as what the detainees report: some 2,300 ml of liquid may be forced into a detainee in as little as 20 minutes.

Force-feeding ceases only "[w]hen a hunger striking detainee voluntarily resumes eating or when the detainee has attained 100% of calculated IBW for at least fourteen (14) consecutive days . . . . " *Medical Management of Detainees*, Exh. D, at 16. Detainees may be regularly force-fed "for a prolonged period of time," which is defined as generally exceeding 30 days. *Id.* at 3. Sixteen numbered paragraphs govern the use of the restraint chair in the force-feeding process, under the title "Chair Restraint System Clinical Protocol for the Intermittent Enteral Feeding of Detainees on Hunger Strike." *Id.* at 18-19.

The March 2013 protocols were revised on November 14, 2013, and again on December 16, 2013.  Near the end of 2013, Government counsel provided Petitioner's counsel with copies of the November 2013 and December 2013 revised protocols under designation as "protected information" that could not be publicly disclosed.  *See* Declaration of Jon B. Eisenberg ¶ 2 ("Eisenberg Decl.").  On March 10, 2014, after numerous denials, Government counsel finally provided Petitioner's counsel with a redacted version of the December 2013 revised protocols for public disclosure (a copy of which is attached to this motion as Exhibit E).  *Id.* ¶ 5.  The public version of the December 2013 revised protocols has been extensively redacted, and none of the publicly-available portions addresses the quantity or speed of continuous or intermittent force-feeding.

In many respects the December 2013 revised protocols are similar to the March 2013 protocols, but in some ways they differ substantially.  For a discussion of these differences, see the Supplemental Memorandum filed separately under seal in connection with this motion (to which unredacted copies of the November 2013 and December 2013 protocols are attached as Exhibits G and H).

Among other things, the December 2013 revised protocols, unlike the March 2013 protocols, do not address the use of restraint chairs in the force-feeding process.  In mid-December of 2013, Government counsel advised Petitioner's counsel that there is now a *separate* SOP that governs the use of restraint chairs, but that Government counsel "will not agree to provide you with that SOP. . . . "  Eisenberg Decl. ¶ 3.  On March 7, 2014, Government counsel reiterated this refusal and also refused a request to disclose any other SOP that currently governs force-feeding and the use of restraints.  *Id.* ¶ 4.  This motion requests an immediate emergency order requiring such disclosure forthwith, so that it may be determined whether the revised

17

restraint chair SOP or any other as-yet-undisclosed SOP on force-feeding differs significantly from the March 2013 protocols.

## C.    Deprivation of Communal Prayer During Ramadan.

During the Islamic holy month of Ramadan, Muslims traditionally perform extra communal prayers—called *tarawih*—after each day's final evening prayer, by reciting portions of the Qur'an while standing, bowing, prostrating and sitting alongside each other.   *See e.g.,* Mohamed Haq Magid, *Reflections on the Qur'an:  A Ramadan Reader*, 11-14 (2011).

Dr. Sayyid M. Syeed, National Director for Interfaith & Community Alliances and former General Secretary of the Islamic Society of North America, explains *tarawih* as follows: "*Tarawih* is a prayer during which the entire Qur'an is recited throughout the month of Ramadan.  One-thirtieth of the Qur'an is recited each night during the 30 nights of the month. Muslims typically arrange for someone with beautiful recitation to lead the prayer and chant the sacred scripture.  This is a special part of Ramadan tradition and is a collectively performed act of piety.  If a person were prevented from performing this highly valued and deeply spiritual practice, it would truly create a great sense of deprivation and distress."  Dr. Sayyid M. Syeed, *The Meaning of Tarawih*, *available at* http://www.nrcat.org/interfaith-campaign-to-address-anti-muslim-sentiment/background/the-meaning-of-tarawih (last visited Mar. 5, 2014).

In 2013, Ramadan began on July 8 and ended on August 7.  On July 14, 2013, the McClatchy news service reported that 25 detainees had "quit their hunger strike during Ramadan" because the Government required them to do so in order to be permitted "to live in communal detention—where they can pray and eat in groups—after months alone in maximum-security lockdown."  Carol Rosenberg, *Guantánamo:  25 Captives Quit Hunger Strike Since Ramadan,* Miami Herald (July 14, 2013), *available at*  http://www.miamiherald.com/

2013/07/14/3499662/guantanamo-25-captives-quit-hunger.html; *see also* Charlie Savage, *15 Held at Guantánamo Are Said to Quit Hunger Strike,* N.Y. Times (July 14, 2013), *available at* http://www.nytimes.com/2013/07/15/us/more-guantanamo-detainees-quit-hunger-strike.html ("at the start of Ramadan . . . the military began moving compliant detainees who were not participating in the hunger strike back into communal living conditions, where they could pray together").  On July 18, 2013, the Associated Press reported that Army Lt. Col. Sam House "said eating regular meals is 'a condition of communal living.'"  David McFadden, *U.S. Military says number of Guantánamo prisoners on hunger strike has dropped to 75 from 106*, Star Tribune (July 18, 2013), *available at* http://www.startribune.com/politics/national/ 216036341.html.

In 2014, Ramadan will begin on approximately June 28 and will end on approximately July 28.  Petitioner reasonably anticipates that this year the hunger-striking detainees will again be deprived of the ability to perform the communal *tarawih* prayer during Ramadan unless they stop hunger-striking.

One detainee says that on July 11, 2013, he was told that if he did not stop hunger-striking he would be moved into isolation, that "[c]ommunal prayers are our tradition in Ramadan," and that "[m]y feeling is that they blackmailed me into taking food."  Declaration of Cori Crider Decl. for Hassan (attached to this motion as Exhibit F ("Exh. F") ¶¶ 5, 6, 7.  Mr. Hassan was also denied communal prayer.  Exh. A ¶ 77.

In 2014, Ramadan will begin on approximately June 28 and will end on approximately July 28.  Petitioner reasonably anticipates that this year the hunger-striking detainees will again be deprived of the ability to perform the communal *tarawih* prayer during Ramadan unless they stop hunger-striking.

## STATEMENT OF JURISDICTION

Challenges by Guantánamo Bay detainees to the conditions of their confinement properly sound in habeas corpus.  *Aamer*, 742 F.3d 1023; *see generally United States v. Wilson*, 471 F.2d 1072, 1080-81 (D.C. Cir. 1972); *Hudson v. Hardy*, 424 F.2d 854, 855 & n.3 (D.C. Cir. 1970); *Creek v. Stone*, 379 F.2d 106, 109 (D.C. Cir. 1967); *Miller v. Overholser*, 206 F.2d 415, 419

(D.C. Cir. 1953).  With regard to the habeas relief that a court might grant, a detainee "may be vindicated by an order enjoining the government from continuing to treat the petitioner in the challenged manner," or "a court may simply order the prisoner released unless the unlawful conditions are rectified, leaving it up to the government whether to respond by transferring the petitioner to a place where the unlawful conditions are absent or by eliminating the unlawful conditions in the petitioner's current place of confinement." *Aamer,* 742 F.3d at 1035.

## ARGUMENT

**I.  THIS COURT SHOULD ENJOIN PETITIONER'S FORCE-FEEDING BECAUSE, GIVEN THE AVAILABILITY OF READY ALTERNATIVES, IT IS NOT REASONABLY RELATED TO LEGITIMATE PENOLOGICAL INTERESTS AND IS THEREFORE UNCONSTITUTIONAL.**

While prison administrators may take measures that impinge on inmates' constitutional rights—as force-feeding plainly does—such measures must be ' "reasonably related to legitimate penological interests." ' *Washington v. Harper*, 494 U.S. 210, 223 (1990) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  Preserving the lives of inmates is a legitimate penological interest, but force-feeding may be undertaken *only* if this interest cannot otherwise be achieved without impinging on constitutional rights.  *Harper*, 494 U.S. at 223.

In contrast, current Guantánamo Bay force-feeding practices cause—and plainly are *intended* to cause—unnecessary suffering.  Legitimate penological interests can be served without causing such suffering.  This Court should enjoin those practices and disapprove the existing Guantánamo Bay protocols in favor of readily-available and widely-used protocols that do not cause such suffering.

**A.      The standard for determining the legality of the Guantánamo Bay force-feeding practices and protocols—whether they are "reasonably related to legitimate penological interests"—asks whether there are any "ready alternatives."**

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84.  Such constitutional protection includes a right to refuse unwanted medical treatment.  *See Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278-79 (1990).

The constitutional rights of *prisoners*, however, must sometimes yield to the practical needs of prison administration.  *Turner*, 482 U.S. at 84.  Accordingly, the Supreme Court has prescribed a test that strikes a balance between these two interests:  "[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.' " *Harper*, 494 U.S. at 223 (quoting *Turner*, 482 U.S. at 89).

A key consideration in determining the reasonableness of a prison regulation is whether there are " 'ready alternatives' " to the regulation.  *Harper*, 494 U.S. at 225 (quoting *Turner*, 482 U.S. at 90).  "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. . . .  [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Turner*, 482 U.S. at 90-91.  The question is "whether, viewed in a pragmatic light, it is feasible for prison authorities to address their institutional concerns through other means."  *Bezio v. Dorsey*, 989 N.E.2d 942, 950 (N.Y. 2013).

This standard has been applied to claims by Guantánamo Bay detainees.  *See Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 120 (D.D.C. 2009); *Hicks v. Bush*, 452 F. Supp. 2d 88, 101 (D.D.C. 2006).  It makes no difference whether the purpose of the detention is intended to be

punitive, because the "legitimate penological interests" test refers to the "interest in security and management" of prisons and jails. *Harper*, 494 U.S. at 247. Thus, even if a restriction accompanying pretrial detention does not amount to punishment (although indefinite detention without trial for twelve years under the notorious conditions at Guantánamo Bay is indisputably punitive), the restriction is still unlawful if it is "not reasonably related to a legitimate [governmental] goal." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

**B.    Force-feeding is an invasive and painful procedure which is inhumane, degrading, and a violation of international law and medical ethics.**

The consensus of the United Nations Rapporteurs, the World Medical Association, the American Medical Association, bioethicists, and human rights organizations is that force-feeding of prisoners falls within the ambit of torture and constitutes cruel, inhuman, and degrading treatment or punishment. *E.g.,* U.N.H.R. Press Release, *OHCHR, IACHR, UN Working Group on Arbitrary Detention, UN Rapporteur on Torture, UN Rapporteur on Human Rights and Counter-Terrorism, and UN Rapporteur on Health reiterate need to end the indefinite detention of individuals at Guantánamo Naval Base in light of current human rights crisis* (May 1, 2013), *available at* http://www.ohchr.org/en/NewsEvents/Pages/ isplaynews.aspx?newsid=13278&langl ("it is unjustifiable to engage in forced feeding of individuals contrary to their informed and voluntary refusal of such a measure"); World Medical Association, *WMA Declaration of Tokyo—Guidelines for Physicians Concerning Torture and other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment* (1975), *available at* http://www.wma.net/en/30publications/10policies/c18/ ("Where a prisoner refuses nourishment and is considered by the physician as capable of forming an unimpaired and rational judgment concerning the consequences of such a voluntary refusal of nourishment, he or she shall not be fed artificially."); World Medical Association, *WMA Declaration of Malta on Hunger*

*Strikers* (1991), *available at* http://www.wma.net/en/30publications/10policies/h31/ ("Forcible feeding is never ethically acceptable. Even if intended to benefit, feeding accompanied by threats, coercion, force or use of physical restraints is a form of inhuman and degrading treatment."); Letter from Jeremy A. Lazarus, M.D., President of Am. Med. Ass'n, to Honorable Chuck Hagel, Sec'y of Def. (Apr. 25, 2013), *available at* http://www.jhsph.edu/research/centers-and-institutes/ center-for-public-health-and-human-rights /_pdf/AMA%20Hunger%20Strikes%20Letter.pdf ("[T]he forced feeding of detainees violates core ethical values of the medical profession."); *Guantánamo: hunger strikes and a doctor's duty*, The Lancet (May 4, 2013), *available at* http://www.thelancet.com/ journals/lancet/article/PIIS0140-6736(13)60962-9/fulltext ("[T]o force-feed infringes the principle of patient autonomy."); Int'l Comm. of the Red Cross, *Hunger strikes in prisons: the ICRC's position* (Jan. 31, 2013), *available at* http://www.icrc.org/eng/resources/documents/ faq/hunger-strike-icrc-position.htm ("The ICRC is opposed to forced feeding or forced treatment; it is essential that the detainees' choices be respected and their human dignity preserved."); Exh. B ¶¶ 3, 4, 5; Exh. C ¶¶ 2, 3.

According to international law, force-feeding of prisoners under restraint and without proof of a life-threatening decrease in state of health constitutes "treatment of such a severe character warranting the characterisation of torture." *Nevmerzhitsky v. Ukraine*, App. No. 548255/00, Final Judgment, ¶ 98, Oct. 12, 2005 (Eur. Ct. H.R.), *available at* http://www.rwi.uzh.ch/lehreforschung/alphabetisch/kiener/Vorlesungen/hs11-1/menschenrechte/ unterlagen/CASE_OF_NEVMERZHITSKY_v_UKRAINE.pdf; *see* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment, Dec. 10, 1984, 1465 U.N.T.S. 85, 113 U.N. Doc. A/39/51, *available at* http://www1.umn.edu/humanrts/instree/

h2catoc.htm ("Convention Against Torture") (defining torture as intentional infliction of "severe pain or suffering"  for specified purposes or reasons); Geneva Convention Relative to the Treatment of Prisoners of War Art. 3, Aug. 12, 1949, 75 U.N.T.S. 135, *available at* http://www1.umn.edu/humanrts/instree/y3gctpw.htm (requiring that armed-conflict detainees in "all circumstances be treated humanely"); *see generally Prosecutor v. Šešelj*, Case No. IT-03-67-T, Urgent Order to the Dutch Authorities Regarding Health and Welfare of the Accused 6 (Int'l Crim. Trib. for the Former Yugoslavia Dec. 6, 2006) (approving force-feeding of prisoner only "to the extent that [it is] not contrary to compelling internationally accepted standards of medical ethics or binding rules of international law," and referencing provision in *WMA Declaration of Malta on Hunger Strikers, supra,* that force-feeding "is never ethically acceptable" and "is a form of inhuman and degrading treatment"); Exh. B ¶ 5.

Medical ethicists have universally condemned the force-feeding of hunger strikers. *See* George J. Annas, Sondra S. Crosby & Leonard H. Glanz, *Guantánamo Bay:  A Medical Ethics-free Zone?*, 369 New Eng. J. Med. 101, 101 (July 11, 2013) ("Annas et al.") ("That force-feeding of mentally competent hunger strikers violates basic medical ethics principles is not in serious dispute."); Michael L. Gross, *Force-Feeding, Autonomy, and the Public Interest*, 369 New Eng. J. Med., 103, 103 (July 11, 2013) at 1 ("Gross") ("[M]ost bioethicists unequivocally oppose force-feeding."); Exh. B ¶¶ 3, 4; Exh. C ¶¶ 2, 3, 9 (a psychiatrist should assess the mental capacity of a hunger-striking prisoner, and "[s]hould the conclusion of the assessment be that the patient has mental capacity to refuse food, the physician is bound by medical ethics and international and US law to refrain from enteral feeding").  "Physicians can no more ethically force-feed mentally competent hunger strikers than they can ethically conduct research on competent humans without informed consent."  Annas et al., *supra* at 102.  "Force-feeding a

competent person is not the practice of medicine; it is aggravated assault." *Id.*  Indeed, a recent article in the *New England Journal of Medicine*, describing Guantánamo Bay as having become "a medical ethics-free zone," urges the military physicians there to refuse to participate in force-feeding. *Id.* at 103.

Forcible nasogastric tube feeding—even short of the "Water Cure"—can be extremely painful, as Petitioner attests.  Stafford Smith Decl. ¶¶ 15, 16, 39, 40, 41, 42-47, 63-67. Another Guantánamo Bay detainee has written:  "I will never forget the first time they passed the feeding tube up my nose.  I can't describe how painful it is to be force-fed this way.  As it was thrust in, it made me feel like throwing up.  I wanted to vomit, but I couldn't.  There was agony in my chest, throat and stomach.  I had never experienced such pain before.  I would not wish this cruel punishment on anyone."  Samir Naji al Hasan Moqbel, *Gitmo Is Killing Me*, N.Y. Times (Apr. 14,  2013),  *available  at*  http://www.nytimes.com/2013/04/15/opinion/hunger-striking-at-guantanamo-bay.html?_r=0.

The Ninth Circuit recently upheld California's legislative ban on force-feeding of ducks and geese to produce foie gras, deeming the ban to be a lawful pursuit of the state's "interest in preventing animal cruelty."  *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013).  The irony of protecting ducks and geese from a practice that is inflicted on human beings at Guantánamo Bay needs no further elaboration.

Petitioner does not wish to die.  Stafford Smith Decl. ¶ 84.  But he is faced with a "Hobson's choice" of either continuing to submit passively to his indefinite detention—lingering in a twilight of half-death—or taking the only peaceful course available to him to protest his situation, in the hope that he can restore himself and others to the freedom that even the Government has determined he deserves. Hunger striking is his only recourse.  *See* Annas et al.,

*supra* at 102 ("Hunger striking is a peaceful political activity to protest terms of detention . . . . Hunger strikers are not attempting to commit suicide . . . [t]heir goal is not to die but to have perceived injustices addressed."); Gross, *supra* at 103 ("Hunger striking is a nonviolent act of political protest.  It is not the expression of a wish to die . . . ."); Exh. B ¶ 6 ("[A] hunger strike is virtually the only means of meaningful expression of personal rights and public appeal open to the petitioners."); Exh. C ¶ 6.

Senator Dianne Feinstein, writing as Chair of the United States Senate Select Committee on Intelligence, has voiced her objection to force-feeding at Guantánamo Bay as being "out of step with international norms, medical ethics and practices of the U.S. Bureau of Prisons." Letter from Dianne Feinstein, Senator, to Honorable Chuck Hagel, Sec'y of Def. (June 19, 2013), *available at* http://www.feinstein.senate.gov/public/index.cfm/press-releases ?ID=8af43b52-0301-42b9-8f72-27f88997bd39.  She states:  "Hunger strikes are a long known form of non-violent protest aimed at bringing attention to a cause, rather than an attempt of suicide.  I believe that the current approach raises very important ethical questions and complicates the difficult situation regarding the continued indefinite detention at Guantánamo." *Id.*

A bipartisan report by The Constitution Project's Task Force on Detainee Treatment found that "Forced feeding of detainees is a form of abuse and must end." The Task Force, a group of 11 Republican and Democrat former U.S. government officials and prominent figures, came to this conclusion after examining detainee statements as well as evidence from doctors and military staff at Guantanamo Bay dating back to 2005.  The Constitution Project, *Report of the Task Force on Detainee Treatment* (2013) at 19, *available at* http://detaineetaskforce.org/read/files/assets/basic-html/index.html#page1.

In *Aamer v. Obama*, the D.C. Circuit observed "we have no doubt that force-feeding is a painful and invasive process that raises serious ethical concerns." *Aamer,* 742 F.3d at 1039. The D.C. Circuit quoted what it called "a scathing report detailing the abuses of medical ethics in the government's treatment of detainees at Guantanamo, Afghanistan, and Iraq, concluding specifically that doctors who assist in the treatment of hunger-striking Guantanamo detainees 'have become agents of a coercive and counter-therapeutic procedure that for some detainees continued for months and years, resulting in untold pain, suffering, and tragedy for the detainees for whom they were medically responsible.' " *Id.* (quoting Institute on Medicine as a Profession and Open Society Forum, Task Force Report, *Ethics Abandoned:  Medical Professionalism and Detainee Abuse in the War on Terror* 84 (2013)).

We also note that current force-feeding practices at Guantánamo Bay violate President Obama's own Executive Order 13491, which states that, consistent with Common Article 3 of the Convention Against Torture, detainees at U.S. detention facilities "shall in all circumstances be treated humanely and shall not be subjected to violence to life and person (including . . . cruel treatment, and torture), nor to outrages upon personal dignity (including humiliating and degrading treatment)." *Executive Order Ensuring Lawful Interrogations*, 13491, § 3(a) (Jan. 22, 2009), *available at* http://www.whitehouse.gov/the-press-office/ensuring-lawful-interrogations, "The Convention's definition of torture includes not only acts committed by public officials, but also those acts to which they acquiesced." Congressional Research Service, *U.N. Convention Against Torture (CAT):  Overview and Application to Interrogation Techniques* 5 (Jan. 26, 2009), *available at* http://www.fas.org/sgp/crs/intel/RL32438.pdf (citation omitted). Thus, persons presently in violation of Executive Order 13491 would include respondents Chuck Hagel, Secretary of Defense, and Rear Admiral Richard Butler, Commander of JTF-GTMO.

**C.     The Guantánamo Bay force-feeding practices and protocols are unreasonable because they inflict unnecessary pain and suffering.**

There can be no doubt that the current Guantánamo Bay force-feeding practices and protocols do not meet the *Turner* standard of reasonableness.  There cannot be any "legitimate penological interests," *Turner*, 482 U.S. at 89, in inflicting "inconvenient" pain and suffering upon force-fed detainees by subjecting them to unnecessary physical violence and restraint, or inserting and withdrawing feeding tubes twice daily, or using excessively-thick feeding tubes, or force-feeding detainees at excessive speeds that echo a notorious form of torture, or using anti-constipation medication to cause them to defecate during the force-feeding process and sit in their own feces..  For this reason alone, this Court should enjoin these egregious abuses.

**D.     The Guantánamo Bay force-feeding practices and protocols are unreasonable because they subject detainees to force-feeding before the detainees are at risk of death or great bodily injury.**

In *Aamer v. Obama*, the D.C. Circuit observed that "the overwhelming majority of courts have concluded, as . . . we do now, that absent exceptional circumstances prison officials may force-feed a starving inmate *actually facing the risk of death*."  *Aamer*, 742 F.3d at 1041 (emphasis added).  This cautious approach, requiring a life-threatening health crisis before a prisoner is force-fed, is exemplified by California's recent response to a two-month hunger strike by 100 state prison inmates.  *See* Joint Request for Order Authorizing Refeeding Under Specified Conditions of Hunger Striking Inmate-Patients and Order Thereon at 1, *Plata v. Brown*, No. 3:01-cv-01351-TEH (N.D. Cal. Aug. 19, 2013), ECF No. 2699 ("*Plata* Order"); Ian Lovett, *Inmates End Hunger Strike in California*, N.Y. Times (Sept. 5, 2013), *available at* http://www.nytimes.com/ 2013/09/06/us/inmates-end-hunger-strike-in-california.html?_r=0.

According to a preexisting California policy on prisoner hunger-strikes, the state "shall grant participants autonomy in health care decisions related to nutrition and shall not force feed the participant" if the inmate clearly and consistently indicates such intent and is able to give informed consent.  *See* Cal. Corr. Health Care Servs., *Inmate Medical Services Policies & Procedures*, Vol. 4, Ch. 22.2, Policy 4.22.2:  Mass Organized Hunger Strike (Sept. 29, 2011, rev. July 2013) § VII.C, at 5, *available at* http://www.cphcs.ca.gov/docs/imspp/IMSPP-v04-ch22.2.pdf ("Policy 4.22.2").

On August 19, 2013, a local federal district judge signed an order in *Plata*—jointly requested by attorneys for the State of California, a prison receiver, and the hunger-striking inmates—which supplements Policy 4.22.2.  The order states, by way of preamble:

> A widespread, orchestrated hunger strike poses significant challenges in the prison setting and presents difficult, sometimes conflicting, policy questions concerning institutional safety and security, inmate-patient autonomy over their person and the receipt of medical treatment, the ability of medical staff to monitor and provide adequate care to striking inmates and medical ethical requirements pertaining to the protection of patients from harm while respecting patient autonomy.

*Plata* Order at 2.

In addressing these concerns, the *Plata* order includes two key provisions:  First, if a prison's chief medical officer "determines, to a reasonable degree of medical certainty, that a hunger-striker is at risk of *near-term death or great bodily injury* in the absence of intervention or has become incompetent to give consent or make medical decisions, refeeding or other lifesaving measures may commence immediately" unless the inmate "previously executed a valid 'do not resuscitate' directive." *Plata* Order at 4 (emphasis added).  Second, "a previously executed 'do not resuscitate' directive will not be considered valid" if the chief medical officer,

"reasonably and in good faith, determines it was *the result of coercion* or otherwise not the product of the hunger striker's free will when executed . . . ." *Id.* (emphasis added).[4]

Thus, Policy 4.22.2 and the *Plata* Order strike a reasonable balance between various competing concerns by affording hunger-striking prisoners the right of personal autonomy until they are at near-term risk of death or great bodily injury, and by disregarding a "do not resuscitate" directive if it is determined to have been coerced.  With this measured approach, intrusions upon personal autonomy and principles of medical ethics are minimized or avoided entirely, while prison security is preserved by ensuring against coercion from other inmates, thereby keeping institutional control in the hands of the warders.

The California approach differs starkly from the March 2013 Guantánamo force-feeding protocols.  Those protocols, like the *Plata* Order, authorize force-feeding if a hunger striker is at risk of near-term death or great bodily injury, by authorizing "[i]nvoluntary medical treatment" if "[t]here is evidence of deleterious health effects reflective of *end organ involvement or damage*."  *Medical Management of Detainees,* Exh. D, *supra* at 5 (emphasis added).  But the Guantánamo protocols go much, much further.  Unlike the *Plata* order, the March 2013 Guantánamo protocols authorize force-feeding in situations *well short* of near-term death or great bodily injury, including:  (1) "[t]here is a pre-existing co-morbidity that might readily predispose to end organ damage (e.g., hypertension, coronary artery disease or any significant heart condition, renal insufficiency or failure, or endocrinopathy," (2) "[t]here is a prolonged period of hunger strike (more than 21 days)," (3) "[t]he detainee is at a weight less than 85% of the calculated

---

[4] Petitioner here is not seeking the right to execute a medical directive allowing him to continue his hunger strike until death.  Rather, he seeks to ensure that he is not force-fed prematurely and is not subjected to methods of force-feeding that cause unnecessary pain and suffering.

Ideal Body Weight (IBW)," or (4) "[t]he detainee has experienced significant weight loss (greater than 15%) from previously recorded or in-processing weight." *Id.*

Thus, for example, a Guantánamo hunger striker may be force-fed simply because he is taking medication for high blood pressure (which is true for many Americans), or has lost a significant amount of weight (to which many Americans aspire), or weighs less than 85% of his Ideal Body Weight (as did Abraham Lincoln during the latter part of his presidency, and as did many Guantánamo detainees when they were first detained), or for no reason other than that he has been on hunger-strike for more than 21 days—without any showing that life-sustaining measures are currently necessary to prevent near-term death or great bodily injury.  These scenarios demonstrate that, in contrast with the California approach, the Guantánamo protocols are "an 'exaggerated response' to prison concerns," *Turner*, 482 U.S. at 90, and that "it is feasible for [the Guantánamo] authorities to address their institutional concerns through other means," *Bezio,* 989 N.E.2d at 950.  None of these four Guantánamo standards constitutes an essential metric for preventing death or serious organ failure.  Yet, to note just another remarkable irony, persons who previously interrogated these detainees were allowed to take all measures short of causing death or serious organ failure in conducting so-called "enhanced interrogations," but now the detainees may be force-fed under painful and humiliating conditions that fall well short of that standard.

The Government will likely contend it has a legitimate interest in preserving the lives and preventing suicidal acts of persons in its custody.  While Petitioner would submit that hunger-striking as a form of protest, without Government restriction, is a valid and rational assertion of basic human dignity in the nightmare world of indefinite detention without trial at Guantánamo Bay, any restriction must be, at the very least, minimally intrusive and painful.  Restricting force-

feeding to situations where a detainee is "at risk of near-term death or great bodily injury," *Plata Order* at 4, is entirely sufficient to preserve lives and prevent suicide, and thus constitutes a ready alternative to the far more expansive Guantánamo force-feeding protocols.  *See* Lovett, *supra* (comment by California state prison official that two-month hunger strike, without force-feeding, ended " 'before any inmates became seriously ill' ").

**E.  The Guantánamo Bay force-feeding practices and protocols are unreasonable because "ready alternatives," as exemplified by U.S. Bureau of Prisons regulations, can achieve the government's legitimate interests.**

The March 2013 protocols purport to have been developed "utilizing procedures adopted from the Federal Bureau of Prisons."  *Medical Management of Detainees,* Exh. D, *supra*  at 1. This statement is false and misleading.  In truth, the Guantánamo Bay force-feeding protocols differ substantially from the regulations governing the U.S. Bureau of Prisons, in at least six ways:

*First*, the Bureau of Prisons regulations authorize forced medical treatment of an inmate *only* when "a physician determines that the inmate's life or health will be threatened if treatment is not initiated *immediately*."  28 C.F.R. § 549.65(a) (emphasis added).  This is consistent with the D.C. Circuit's observation in *Aamer v. Obama* that most courts have concluded that "absent exceptional circumstances prison officials may force-feed a starving inmate *actually facing the risk of death*."  *Aamer,* 742 F.3d at 1041 (emphasis added).  In contrast, the Guantánamo Bay protocols also authorize force-feeding in situations *short* of near-term death or great bodily injury.

*Second*, the Bureau of Prisons regulations restrict the use of restraints to "only that amount of force necessary to gain control of the inmate."  28 C.F.R. §§ 552.20, 552.22(c).  This effectively requires that the level of restraint be the *least restrictive necessary*.  In contrast, the

Guantánamo Bay protocols prescribe the routine use of a "chair restraint system"—the *most* restrictive form of restraint—for *all* detainees who are being force-fed, regardless of necessity. *Medical Management of Detainees,* Exh. D, *supra* at 16, 18-19.

*Third*, the Bureau of Prisons regulations call for restraint systems using just four points of restraint. 28 C.F.R. § 552.24. In contrast, the restraint chairs used at Guantánamo Bay are more constricting, with the detainee forcibly strapped down tightly at his hands, legs, waist, shoulders, and head. Stafford Smith Decl. ¶ 38.

*Fourth*, the Bureau of Prisons regulations vest a *physician* with the authority to decide whether to force-feed an inmate. 28 C.F.R. § 549.65(c); *see* U.S. Dep't of Justice, Program Statement No. P5562.05 at 7 (July 29, 2005), *available at* http://www.cbsnews.com/htdocs/pdf/BOP_FBI_hungerstrikepolicy.pdf ("Only the physician may order involuntary medical treatment."). In contrast, the Guantánamo Bay protocols vest the *JTF-GTMO Commander* with this decision-making authority. *Medical Management of Detainees,* Exh. D, *supra* at 4.

*Fifth*, the Bureau of Prisons regulations prohibit the use of restraints on an inmate's face. 28 C.F.R. § 552.22(c)(h)(2). In contrast, under the Guantánamo Bay protocols, "a mask is placed over the detainee's mouth" during force-feeding. *Medical Management of Detainees,* Exh. D, *supra* at 18.

*Sixth*, the Bureau of Prisons *videotapes* force-feedings as a protection against abusive treatment. Program Statement No. P5562.05 at 7. Videotaping is not required by the Guantánamo Bay protocols.

Plainly, there are ready alternatives to the Guantánamo Bay force-feeding practices and protocols, as exemplified by the Bureau of Prisons regulations, which demonstrate that the force-feeding at Guantánamo Bay is not reasonable, but is "an 'exaggerated response' to prison concerns." *Turner* at 90.

**F.    The Government has such complete control over the Guantánamo Bay detainees that hunger-strikers present no threat to institutional security.**

The Government will likely contend that the force-feeding at Guantánamo Bay is reasonably related to the legitimate interest in preserving prison security.  But surely no federal prison is more secure than the Guantánamo Bay detention facility.  The Government might suggest that any death of a hunger-striking detainee will undermine security there, but institutional security surely was not undermined by the suicides that have occurred.  (Indeed, evidence can be adduced in this proceeding that the tragic 2012 suicide of detainee Adnan Latif was provoked, in part, by the gratuitous pain and suffering that had been inflicted through his force-feeding.)  Nor has there been any indication of security breaches when prisoners have been killed during interrogations at various other facilities since 2001.

The Government has absolute and unfettered control over these detainees, unchecked by anything other than the writ of habeas corpus.  Institutional security at Guantánamo Bay would be threatened only if the detainees were able to wrest away a degree of that control—which could happen if some detainees could be coerced into joining a hunger strike.  But the *Plata* Order prevents such loss of institutional control by authorizing force-feeding when it is fairly determined that an inmate is hunger-striking under coercion.  This safeguard is a ready alternative at Guantánamo Bay.

**G.    Even if the force-feeding protocols were to be upheld, this Court should grant habeas relief because, in practice, the Government is deviating from those protocols.**

Even if this Court were to conclude that the Guantánamo Bay force-feeding protocols meet the *Turner* standard, the Court should still grant habeas relief because, in actual practice, the Government is *deviating* from those protocols, for purposes that must be seen through the prism of General Craddock's desire to inflict suffering in order to coerce detainees to stop hunger-striking.    For example, appropriately sized feeding tubes were replaced with unnecessarily thick (and consequently painful) feeding tubes. *Compare Medical Management of Detainees,* Exh. D, *supra* at 15 (specifying size "10 French or 12 French feeding tube") *with* Exh. A ¶ 41 (detainee describes use of size 14 French feeding tube).  And so-called "chronic enteral feeders" are being force-fed in restraint chairs instead of in single-point restraints. *Compare Medical Management of Detainees,* Exh. D, *supra* at 19 ("Detainees who are chronic enteral feeders and are living in communal blocks" are to be force-fed "with the detainee in single point leg restraint") *with* Exh. A ¶¶ 97, 98 (detainee reports that compliant detainees are nevertheless being force-fed in restraint chairs).

At a minimum, if this Court were to uphold the Guantánamo Bay force-feeding protocols, the Court should order the Government to comply with those protocols.

**II.    DEPRIVATION OF COMMUNAL PRAYER VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT (RFRA).**

The right of religious free exercise is enshrined in the First Amendment and further protected by the Religious Freedom Restoration Act (RFRA), which imposes a heightened standard of review where government substantially burdens "a person's" religious exercise. 42 U.S.C. § 2000bb-1.  This protection includes the right of prisoners to pray communally.  "It is well established that prisoners have a constitutional right to participate in congregate religious

services.   Confinement in keeplock does not deprive prisoners of this right." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (citation omitted); *see also Makin v. Colorado Dep't of Corrections*, 183 F.3d 1205, 1213 (10th Cir. 1999) (denying Muslim prisoner the ability to observe the Ramadan fast infringes his right to exercise his religion freely).

Petitioner contends the Government violated this right in 2013 by depriving the hunger-striking Guantánamo Bay detainees of the ability to perform communal *tarawih* prayers during Ramadan.[5]  The Government threatens to do so again in 2014.

Petitioner acknowledges that a panel of the D.C. Circuit has held that Guantánamo Bay detainees are not protected "person[s]" within the meaning of the RFRA.  *Rasul v. Myers*, 563 F.3d 527, 532-33 (D.C. Cir. 2009); *accord, Aamer*, 742 F.3d at 1042-43; *but cf. Rasul* at 533 (Brown, J., concurring),  ("There is little mystery that a person is an individual human being . . . ," and "[u]nlike the majority, I believe Congress [did not specifically intend[] to vest the term persons with a definition . . . at odds with its plain meaning.") (citations and internal quotations omitted) (second and third brackets in original).  But *Rasul*, and the precedents upon which it relied, predated *Citizens United v. FEC*, 558 U.S. 310 (2010), which espoused a dramatically expansive view of the scope of constitutional protection for "persons"—in  that case, for corporate personhood.[6]

In *Citizens United*, the Supreme Court expressly declined to decide the question of whether the First Amendment's protection for "persons" extends to "foreign individuals or associations."  *Citizens United,* 558 U.S. at 362; *see generally Bluman v. FEC*, 800 F. Supp. 2d

---

[5] The D.C. Circuit rejected this argument in *Aamer*, 742 F.3d at 1042-43.  We assert the argument here in order to preserve it for appellate review.

[6] This term the Supreme Court will consider whether a for-profit corporation may, based on religious objections, deny its employees health coverage for contraceptives. *Sebelius v. Hobby Lobby Stores, Inc.*, No. 13-354, *cert. granted*, 134 S. Ct. 678 (Nov. 26, 2013).

281, 292 (D.D.C. 2011) (federal ban on political contributions by foreign nationals held constitutional, but "we do not decide whether Congress could prohibit foreign nationals from engaging in speech other than" such contributions). Thus, *Citizens United* revives the issue addressed in *Rasul* and makes it an open question whether RFRA's protection extends to non-resident aliens.

Although the RFRA was enacted 17 years before *Citizens United*, it implements the Free Exercise Clause of the First Amendment, *see Rasul*, 563 F.3d at 534 (Brown, J., concurring), and *Citizens United* espoused "'ancient First Amendment principles.'" *Citizens United*, 558 U.S. at 319 (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 490 (2007)). *Citizens United* cited 20 Supreme Court cases—predating the RFRA—for the proposition that "[t]he Court has recognized that First Amendment protection extends to corporations." *Id.* at 342. Those 20 pre-RFRA cases underlying *Citizens United*, and thus *Citizens United* itself, have a bearing on the meaning of "person" in the RFRA. And given that those 20 pre-RFRA cases are *First Amendment* cases, they should have a greater bearing on the meaning of the RFRA—which, after all, implements the First Amendment—than the Fourth and Fifth Amendment cases on which *Rasul* relied. *See Rasul*, 563 F.3d at 533.

A federal district court recently afforded the protections of the Free Exercise Clause to non-United States citizens who were detained in immigration custody after the terrorist attacks of September 11, 2001, holding the detainees had a *Bivens* remedy for violation of their free exercise rights while confined. *See Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 351-55 (E.D.N.Y. 2013). That holding is consistent with affording the protections of the Free Exercise Clause, as implemented by the RFRA, to the Guantánamo detainees.

Moreover, "because *intentional* burdening of religious practices is involved here," the infringement on the detainees' religious free exercise cannot even be justified as reasonably related to legitimate penological interests, but can be justified only if such burdening "advances interests of the highest order and is narrowly tailored in pursuit of those interests . . . ." *Turkmen*, 915 F. Supp. 2d at 354 n.27, 355.

It hardly advances domestic and international respect for American democracy if the Supreme Court treats corporations as "persons," but the President insists that human beings detained at Guantánamo Bay who wish to practice their religion are not "persons" entitled to the fundamental protection of religious free exercise.  We submit that it is in the Nation's best interest to respect the religious beliefs of all persons it incarcerates—even, and perhaps especially, the Guantánamo Bay detainees.  *Citizens United* reopens an issue that a panel of the Court of Appeals decided in a manifestly and tragically incorrect manner.  The right of religious free exercise is a core American value, and to deprive the Guantánamo Bay detainees of that right does great damage to America in the eyes of the world in general and the world's Muslims in particular.  The affront to human dignity in failing to accord these men the status of "persons" is incalculable.

## III.   PETITIONER MUST BE AFFORDED THE PROTECTIONS OF INTERNATIONAL LAW PURSUANT TO THE TREATY OF FRIENDSHIP AND COMMERCE BETWEEN THE UNITED STATES AND PAKISTAN.

As a separate and independent basis for challenging his force-feeding and denial of religious free exercise, Petitioner, as a Pakistani national, asserts the protections of international law pursuant to a treaty between the United States and Pakistan.

In 1959, the United States entered into a treaty with Pakistan which provides: "Nationals of either Party within the territories of the other Party shall be free from molestations of every kind, and shall receive the most constant protection and security, in no case less than that required by international law." Treaty of Friendship and Commerce Between the United States of America and Pakistan, art. III, 12 U.S.T. 110 , 404 U.N.T.S. 259 (Feb. 12, 1961), *available at* http://tcc.export.gov/trade_agreements/all_trade_agreements/exp_005355.asp). Thus, petitioner is entitled to the protections of international law, which include both the right not to be force-fed, *see supra* at 24-25, and the right to pray communally, *see* International Covenant on Civil & Political Rights, Art. 18, para. 1 (1976), *available at* http://www.refworld.org/ pdfid/3ae6b3aa0.pdf (right to freedom of religion includes "freedom, either individually or in community with others . . . , to manifest [one's] religion or belief in worship, observance, practice and teaching") ("ICCPR"). Moreover, Petitioner has the right not to be tortured. ICCPR art. 7; Convention Against Torture art. 2.[7]

Because Petitioner is plainly a "person" within the meaning of the provisions of international law protecting his right to pray communally, he must be afforded that right pursuant to the U.S.-Pakistan treaty, regardless of whether he is considered a "person" for purposes of the First Amendment and the RFRA.

---

[7] Congress has prohibited the Guantánamo Bay detainees from invoking the Geneva Conventions, *see* Pub. L. 109-366, § 5(a), 120 Stat. 2600 (2006), but not other provisions of international law.

IV.     **PETITIONER MEETS THE CRITERIA FOR GRANTING A PRELIMINARY INJUNCTION.**

In deciding whether to grant a preliminary injunction, this Court is required to consider four factors:  (1) whether Petitioner has made a strong showing that he is likely to prevail on the merits; (2) whether Petitioner would be irreparably injured without such relief; (3) whether such relief would substantially harm the Government; and (4) where the public interest lies.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As demonstrated above, each of these criteria favors Petitioner.  Petitioner is likely to prevail on the merits, given that: (1) there are ready alternatives to, and thus there is no legitimate penological interest in, Petitioner's current force-feeding; (2) depriving him of the ability to pray communally during Ramadan violates the First Amendment and RFRA; and (3) both violate the U.S.-Pakistan treaty, which affords Petitioner the protections of international law.  Without an injunction, Petitioner will continue to be irreparably injured by serious violations of constitutional and human rights—most notably by his continuing to suffer grievously and unnecessarily harsh practices in his force-feeding.  In contrast, the Government can hardly be injured by following ready alternatives to current force-feeding practices or by allowing Petitioner to pray communally.  And surely the public interest cannot lie in continuing to pile human rights violations upon human rights violations at Guantánamo Bay.  The Nation's best interest lies in honoring international law, rules of medical ethics and basic human decency, as well as respecting the right of religious free exercise.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests this Court to issue a preliminary injunction granting the following relief:

1.      Enjoin Respondents from performing wrongful and gratuitously painful practices in the force-feeding of any detainee at Guantánamo Bay, including but not limited to (a) unnecessary forcible and violent removal of detainees to the force-feeding location, (b) unnecessary and degrading genital searches, (c) unnecessary use of restraint chairs, (d) unnecessary insistence on force-feedings twice per day, (e) insertion and withdrawal of feeding tubes twice each day, (f) use of unnecessarily thick feeding tubes, (g) use of a dangerous and unreliable method to determine placement of feeding tubes, (h) unnecessarily rapid force-feeding, including any form of force-feeding that resembles the "Water Cure" form of torture, and (i) the use of over-feeding and anti-constipation medication to induce defecation during force-feeding.

2.      Enjoin Respondents from force-feeding any detainee at Guantánamo Bay unless a physician determines that, as a result of hunger-striking, the detainee is actually facing an imminent risk of death or great bodily injury.

3.      Declare the current Guantánamo Bay force-feeding protocols to be invalid, and direct Respondents to promulgate new protocols forthwith that conform to standards as exemplified by the U.S. Board of Prisons regulations.

4.      If the Court determines that the current Guantánamo Bay force-feeding protocols are valid, issue an order directing Respondents to comply with those protocols.

5.      Issue an order directing Respondents to allow all hunger-striking detainees at Guantánamo Bay, or at least Petitioner as a Pakistani national, to perform the Islamic *tarawih* prayers communally during Ramadan in 2014.

41

Petitioner also requests an immediate emergency order requiring Respondents to forthwith disclose to Petitioner's counsel the current SOP that governs the use of restraint chairs in the force-feeding of Guantánamo Bay detainees, as well as any other as-yet-undisclosed SOP on force-feeding.

Respectfully submitted,


   /s/ Jon B. Eisenberg
**JON B. EISENBERG** (CA State Bar #88278)
1970 Broadway, Suite 1200
Oakland, CA 94612
(510) 452-2581
*jeisenberg@horvitzlevy.com*


   /s/ Cori Crider
**REPRIEVE**
Clive Stafford Smith (LA Bar #14444)
Cori Crider (NY Bar #4525721)
Alka Pradhan (D.C. Bar #1004387)
P.O. Box 72054
London EC3P 3BZ
United Kingdom
011 44 207 553 8140
*clive.stafford.smith@reprieve.org.uk*
*cori@reprieve.org.uk*
*alka.pradhan@reprieve.org*


   /s/ Eric L. Lewis
**LEWIS BAACH PLLC**
Eric L. Lewis (D.C. Bar #394643)
Elizabeth L. Marvin (D.C. Bar #496571)
1899 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20006
(202) 833-8900
*eric.lewis@lewisbaach.com*
*elizabeth.marvin@lewisbaach.com*

Dated:  March 27, 2014          *Counsel for Petitioner/Plaintiff*