UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMAD AHMAD GHULAM RABBANI, ) ) Petitioner, ) ) v. ) ) BARACK OBAMA, *et al.* ) ) Respondents. ) | Civil No. 05-1607 (RCL) |

## MEMORANDUM OPINION

Before the Court is the petitioner's motion for a preliminary injunction [306] seeking to enjoin the respondents (hereinafter, the government) from force-feeding hunger-striking detainees held at the United States Naval Base at Guantanamo Bay, Cuba. Upon consideration of the petitioner's motion [306], the government's opposition [319], the petitioner's reply [320], the petitioner's and government's respective briefs regarding any claims remaining to be decided in this case [341, 344], the petitioner's status report [346] filed December 16, 2014, the applicable law, and the entire record herein, the Court will DENY the petitioner's motion for a preliminary injunction.

I.   BACKGROUND

Petitioner Mohammad Ahmad Ghulam Rabbani is a Pakistani national who has been detained at Guantanamo Bay for more than ten years without ever having been charged with a crime. Pet'r's Mot. Prelim. Inj. 1. Since February 2013, Rabbani, along with other detainees, has engaged in a hunger strike to protest his detention. *Id.* In response to Rabbani's hunger strike, the medical staff at Guantanamo Bay determined that it was necessary to forcibly feed the

petitioner through an enteral feeding process. *See* Resp't's Opp'n 5-6, 13-14. On occasions when Rabbani has refused either to walk voluntarily to his enteral feeding session or to return to his cell following a session, Guantanamo Bay guards have employed Forced Cell Extraction ("FCE") procedures to move the petitioner. *Id.* 15. Rabbani is *not* seeking to enjoin force feeding as a method for preventing death or serious bodily injury to hunger-striking detainees. *Id.* at 2 (The "[p]etitioner wishes to make clear that he is not seeking an injunction to permit him to continue his hunger strike until death."). Instead, the thrust of Rabbani's grievance is that the enteral feeding *process* is unconstitutionally "forcible and violent." *See* Mot. 41.

Confronting a force-feeding fact pattern substantially similar to—if not even more "forcible and violent" than—Rabbani's, Judge Kessler recently denied a petitioner's motion for a preliminary injunction to enjoin the methods and protocols governing the force-feeding process at Guantanamo Bay. *Dhiab v. Obama*, No. 05 Civ. 1457, 2014 WL 5795483 (D.D.C. Nov. 7, 2014). Prior to Judge Kessler's Memorandum Opinion, Petitioner Dhiab had narrowed his claims to those concerning (1) the insertion and removal of a nasogastric tube; (2) the use of auscultation—"a procedure to ensure that the nasogastric tube is properly pushed into the stomach, rather than the lungs"; (3) the use of a Five Point Restraint Chair during enteral feeding; (4) force-feeding in the absence of imminent risk; and (5) whether non-medical officials have final authority to allow force-feeding. *Id.* at *3, *5-*10. In reaching the conclusion that Dhiab's petition was insufficient for a preliminary injunction, Judge Kessler evaluated the remaining force-feeding claims under the "deliberate indifference" standard established by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976).[1] As Judge Kessler explained, the

---

[1] The one exception to Judge Kessler's use of the deliberate indifference standard was with regard to the issue of final authority to allow force-feeding, which the Judge decided under the "likelihood of success" prong of the preliminary injunction test. *Dhiab*, 2014 WL 5795483, at *8-*9

*Estelle* Court "ruled that in assessing whether the government has met its obligation to provide medical care for those whom it incarcerates, 'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Dhiab*, 2014 WL 5795483, at *4 (quoting *Estelle*, 429 U.S. at 105).

Following Judge Kessler's denial of Dhiab's petition for a preliminary injunction, this Court ordered the parties to notify the Court of "what, if any, claims remain to be decided in this case that were not already addressed" by Judge Kessler in *Dhiab*. Order, Nov. 12, 2014, ECF No. 340. Petitioner Rabbani responded that the Court (1) "must decide whether this case implicates the Fifth Amendment due process right to refuse medical treatment," and (2) must determine whether FCEs are lawful. Pet'r's Notification 1, Nov. 19, 2014, ECF No. 341. On the Fifth Amendment question, Rabbani argues that Judge Kessler erred in using the *Estelle* deliberate indifference standard, and instead should have employed the standard of proof articulated in *Turner v. Safley*, 482 U.S. 78 (1987). In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is *reasonably related to legitimate penological interests*." *Id.* at 89 (emphasis added). Rabbani, therefore, largely seeks to relitigate the legal standard of proof at issue in Guantanamo Bay force-feeding cases. According to Rabbani, then, the FCE question as well as a new question regarding the government's purported refusal to test Rabbani for lipoid pneumonia, which Rabbani raises for the first time in a status report filed December 16, 2014, are the only remaining *fact-based* inquiries not addressed by Judge Kessler in *Dhiab*.[2]

---

[2] The Court assumes that Rabbani's decision not to cite any additional outstanding issues in this case means that the constitutional question and the FCE question are the only issues left to be evaluated. *See generally* Notification.

3

## II. LEGAL STANDARD

To satisfy the requirements of the traditional four-factor test for a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Abdullah v. Obama*, 753 F.3d 193, 197 n.4 (D.C. Cir. 2014) (clarifying that "the traditional four-factor preliminary injunction test, unsurprisingly, applies to Guantanamo detainees"). Here, Rabbani fails demonstrate that he is likely to succeed on the merits of his force-feeding, FCE, and lipoid pneumonia testing claims, rendering analysis of the remaining three factors of the preliminary injunction test superfluous.

## III. ANALYSIS

### A. Force-Feeding

Rabbanie contends that the primary question before the Court is "whether this case implicates the Fifth Amendment due process right to refuse medical treatment." *See* Notification 1. However, the Court need not answer such a question, and, thus, need not definitively determine whether *Estelle*'s deliberate indifference standard or *Turner*'s reasonably related standard applies to Rabbani's force-feeding claims because these claims fail, at the preliminary injunction stage, under either *Estelle* or *Turner*.

#### *1. Deliberate Indifference Standard*

*Estelle*'s deliberate indifference standard governs a court's review of the adequacy of medical care received by prisoners under the Eighth Amendment's prohibition against "cruel and unusual punishments." *Estelle*, 429 U.S. at 104; U.S. Const. amend. VIII. While Dhiab, like Rabbani, positioned his motion for a preliminary injunction as a Fifth Amendment due process

4

claim, *see* Mot. Prelim. Inj. 20, *Dhiab*, No. 05 Civ. 1457 (D.D.C. Apr. 18, 2014), ECF No. 203 (citing *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278-79 (1990), for the due process right to refuse unwanted medical treatment); Notification 1, Judge Kessler found that Dhiab was actually challenging the "day to day procedures" involved in carrying out force-feedings, rather than challenging a constitutional right to be free from force-feeding entirely, *Dhiab*, 2014 WL 5795483, at *3, *5.

If deliberate indifference represents the appropriate standard of proof to apply to Rabbani's force-feeding-related claims, then this Court would adopt Judge Kessler's Memorandum Opinion in *Dhiab*, 2014 WL 5795483.[3] Without deciding the issue, the Court notes its belief that, for two reasons, it appears unlikely that *Turner* applies to Rabbani's motion for a preliminary injunction.

First, *Turner* applies when a prisoner's constitutional right is at stake. 482 U.S. at 89. Here, while a purported right to be free from force-feeding may possibly qualify under the rubric of the constitutional right to refuse unwanted medical treatment, *see Aamer v. Obama*, 742 F.3d 1023, 1038-39 (D.C. Cir. 2014), the Court agrees with its colleague, Judge Kessler, that challenges to individual *procedures* that the government uses to force-feed hunger-striking detainees—e.g., the use of nasogastric tubes, the method of auscultation, the use of Five Point Restraint Chairs, etc.—would likely not rise to a constitutional claim. *See Dhiab*, 2014 WL

---

[3] Rabbani argues that if Dhiab is released from custody at Guantanamo Bay, "such a turn of events would revive *all* of the issues before Judge Kessler that are also presented here, for a decision by this Court in the first instance." Notification 8-9; Pet'r's Status Report 1, Dec. 16, 2014, ECF No. 346. On December 8, 2014, the government provided notice that Dhiab was, in fact, released from U.S. custody and transferred to the control of the Government of Uruguay. Notice of Transfer, *Dhiab*, No. 05 Civ. 1457, ECF No. 381. However, even if Dhiab's release subjects Judge Kessler's Memorandum Opinion to vacatur, the persuasiveness of Judge Kessler's factual findings and legal reasoning remains intact. *See Nat'l Black Police Ass'n v. D C*, 108 F.3d 346, 354 (D.C. Cir. 1997) ("[S]ince the district court's opinion will remain 'on the books' even if vacated, albeit without any preclusive effect, future courts will be able to consult its reasoning."); *Coal. to End Permanent Cong. v. Runyon*, 979 F.2d 219, 221 (D.C. Cir. 1992) (Silberman, J., dissenting) ("even a vacated opinion, while no longer the law of the case, still may carry 'persuasive authority' (citing *Los Angeles v Davis*, 440 U.S. 625, 646 n.10 (1979) (Powell, J., dissenting)).

5795483, at *5. Rabbani admits that he is not claiming a categorical right to refuse force-feeding, Mot. Prelim. Inj. 2, 32 (The "[p]etitioner wishes to make clear that he is not seeking an injunction to permit him to continue his hunger strike until death.")), but instead is challenging the process used to decide that force-feeding is appropriate as well as the methods used to accomplish the force-feeding procedure. Consequently, the question for the Court is not whether the government can force-feed Rabbani—it can—but rather whether the *specific manner* in which it force-feeds Rabbani is lawful. The Court finds that an inquiry into the methods of force-feeding is more closely related to *Estelle*'s application to *how* medical care is delivered than to *Turner*'s application to whether a detainee can refuse medical treatment in the first instance.[4]

Second, even if the government's methods of force-feeding implicate a due process right to refuse medical treatment, the Court of Appeals for the District of Columbia Circuit has declared that "the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States." *Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009) (collecting cases) ("*Kiyemba I*") *vacated and remanded*, 559 U.S. 131 (2010), *and judgment reinstated and modified*, 605 F.3d 1046 (D.C. Cir. 2010). Given that Rabbani is a nonresident alien, it would appear that existing Circuit precedent forecloses any remedy for an alleged Fifth Amendment due process violation and, accordingly, rebuts Rabbani's argument that *Turner*, which only applies to constitutional claims, is the appropriate standard here.[5] *See Al*

---

[4] The Court notes that it is a closer call whether Rabbani's claim regarding government force-feeding in the absence of imminent risk impinges his constitutional right to refuse medical treatment or, conversely, is more a question of how the government implements medical treatment. However, as the Court explains below, even if this particular claim requires a *Turner* analysis, Rabbani's argument that the Guantanamo Bay protocols "authorize force-feeding in situations well short of near-term death or great bodily injury," Prelim. Inj. 30, fails to demonstrate a likelihood of success on the merits.

[5] Indeed, the Circuit expressed some skepticism that *Turner* applies to force-feeding challenges brought by nonresident aliens on due process grounds. The Circuit was sure to present a "*But cf.*" to *Kiyemba I* when, in

6

*Bahlul*, 767 F.3d at 33 ("[I]t remains the law of this circuit that, after *Boumediene*, aliens detained at Guantanamo may not invoke the protections of the Due Process Clause of the Fifth Amendment." (citing *Kiyemba I*)).

## 2. Reasonably Related Standard

Applying *Turner* to the present facts does not alter Judge Kessler's conclusion that a preliminary injunction is improper. Again, the *Turner* Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. It is true that the Supreme Court has established a "constitutionally protected liberty interest in refusing unwanted medical treatment," *Cruzan*, 497 U.S. at 278, and that the Circuit in *Aamer* left open the possibility that force-feeding implicates such a liberty interest, 742 F.3d at 1038-39. It is also true that both parties implicitly agree—and this Circuit has held—that the government has a legitimate interest in keeping Guantanamo detainees alive. *E.g.*, Notification 4; Resp't's Resp. 3; *see also Aamer*, 742 F.3d at 1040-41 (recognizing "the government's legitimate penological interest[] . . . in preserving the [detainee]'s life"). Therefore, the question here would be whether the force-feeding of Rabbani is reasonably related to the government's interest in preserving his life.

---

*Aamer*, it "assume[d] without deciding that the constitutional right to be free from unwanted medical treatment extends to nonresident aliens detained at Guantanamo and that [it] should use the *Turner* framework to evaluate petitioners' claim." 742 F.3d at 1039 (D.C. Cir. 2014).

Rabbani seeks to narrow the holding in *Kiyemba I*, claiming that it "did not address the extraterritorial reach of the constitutional right to refuse medical treatment." Notification 5-6. Yet such a reading seems only to be wishful thinking on the part of the petitioner, since the Circuit placed no such limiting qualification on its assertion that the due process clause does not apply to aliens like Rabbani. Indeed, the Circuit recently rejected Rabbani's argument, Notification at 6, that interpreting *Kiyemba* as a categorical bar on substantive due process claims would contravene the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008). *See Al Bahlul v. United States*, 767 F.3d 1, 32-33 (D.C. Cir. 2014) ("[The Supreme Court 'explicitly confined its constitutional holding only to the extraterritorial reach of the Suspension Clause' and 'disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause.' (quoting *Rasul v Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009))).

To determine the reasonableness of a regulation, the Supreme Court identified four relevant factors: (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the [asserted constitutional] right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" to the regulation. *Turner*, 482 U.S. at 89-91 (internal quotation marks and citations omitted). While Rabbani seeks to emphasize the importance of the fourth factor, "ready alternatives," Notification 1, 4, the Circuit has explained that the first factor, "a valid, rational connection," weighs heaviest on a court's *Turner* analysis, *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) ("Although we examine each factor, the first is the most important."); *Kimberlin v. U.S. Dep't of Justice*, 318 F.3d 228, 233 (D.C. Cir. 2003) (describing the first factor as the "most important factor"); *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998) ("Although the [*Turner*] factors are intended as guides to a single reasonableness standard, the first factor looms especially large. Its rationality inquiry tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions." (internal citation omitted)).

As a threshold matter, *Turner* is invoked when a court is examining a "regulation" as a whole—i.e. whether force-feeding, *generally*, impinges on a detainee's constitutional right. *Turner*, 482 U.S. at 89 (the purpose of the test is to "determin[e] the reasonableness of the regulation at issue"); *see also Aamer*, 742 F.3d at 1041 (noting that a petitioner may, in a non-preliminary injunction motion, attempt to show the district court that "there are 'ready alternatives' to force-feeding that the government might employ to achieve these same legitimate interests"; not that there are ready alternatives to the specific *methods* used to force-feed

8

detainees). Protection of a constitutional right to refuse unwanted medical care does not command the Court to evaluate each and every aspect of the force-feeding process under *Turner*. Accordingly, *Turner* is not the appropriate test to determine *how* the government carries out a given regulation. *Cf. Estelle*, 429 U.S. at 104-05 (the deliberate indifference standard applies to the adequacy of medical treatment for prisoners). As mentioned above, while the act of force-feeding may implicate the Fifth Amendment due process clause, the use of nasogastric tubes, the method of auscultation, and the use of Five Point Restraint Chairs, among other specific methods for *performing* a force-feeding, are not due process concerns, but rather—at most—represent Eighth Amendment issues. *Id.*

Thus, *Turner* is satisfied if the Court accepts that the right to be free from unwanted medical care is not unconstitutionally infringed by Rabbani's force-feeding. Indeed, at the preliminary injunction stage, the Circuit already reached an analogous conclusion in *Aamer*. 742 F.3d at 1041. And here, the petitioner presents the Court with no additional factual or legal reasons—beyond those already presented and resolved in *Aamer* and *Dhiab*—to question, under the elevated bar for granting a preliminary injunction, the methodology used by the medical staff at Guantanamo Bay to determine that force-feeding is necessary to keep Rabbani alive. Rabbani's principal contention that, contrary to Circuit law, he has always been force-fed before facing actual risk of death or great bodily injury, *see* Notification 4; *Aamer*, 472 F.3d at 1041, is contradicted by the affidavit of Commander            , the Senior Medical Officer of the Guantanamo Bay Joint Medical Group ("JMG"). Opp'n Ex. 7 (Declaration of Commander            , M.D., May 7, 2014). Commander      details the reasons underlying the JMG's determination to force-feed Rabbani, *id.* ¶¶ 4-7, and concludes that, "if enteral feeding was discontinued, significant risks to [Rabbani's] life and health could immediately result." *Id.* ¶ 15.

Commander declaration provides, at the very least, "a valid, rational connection between" the decision to force-feed Rabbani and the "legitimate governmental interest" in preserving Rabbani's life. *Turner*, 482 U.S. at 89.[6] It is important to recall that *Turner*'s first factor is not intended to be a stringent bar for the government to meet. The government need only show that "the logical connection between the regulation and the asserted goal is [not] so remote as to render the policy arbitrary or irrational," and that "the governmental objective [is] a legitimate and neutral one." *Id.* at 89-90. Thus, given the substantial weight accorded the "valid, rational connection" factor, the Court finds that Rabbani cannot demonstrate "a substantial likelihood of success on the merits." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011) ("In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits.").

Such a conclusion is bolstered by the deferential standard traditionally applied to prison operations—a standard this Court finds especially germane in the context of medical care given

---

[6] Rabbani further argues that the Guantanamo Bay Standard Operating Procedures ("SOP") for the medical management of detainees on hunger strike, dated March 5, 2013, "authorize force-feeding in situations well short of near-term death or great bodily injury." Mot. Prelim. Inj. 30 (citing Ex. D). The SOP was revised in December 2013. *See* Opp'n Ex. 2. The Court finds that the criteria for "involuntary enteral feeding" delineated in the December 2013 SOP, which are substantially similar to those from the March 2013 SOP cited in Rabbani's motion for a preliminary injunction, fall well within the bounds of discretion, *see infra*, afforded to a prison's medical staff when determining what constitutes imminent risk of death or great bodily injury. The Court understands the need to evaluate hunger-striking detainees based on a more flexible set of medical factors, because "reliance on one factor alone can be subject and does not provide the best data to determine whether enteral feeding is necessary." Opp'n Ex. 1 at ¶ 11 (Declaration of Commander M.D., Apr. 17, 2014). The SOP's multifactor list of *suggested* guidelines for determining if force-feeding is necessary focuses on dramatic weight loss or end organ damage. *See* Opp'n Ex. 2 at 2-3, 12. Such considerations strike the Court as wholly consistent with the requirement that force-feeding may occur only when a detainee faces at least an actual risk of great bodily harm. Undoubtedly, there is a "valid, rational connection" between such guidelines and the government's interest in keeping detainees alive. While Rabbani seeks to present hypothetical scenarios where a completely healthy detainee could qualify for involuntary enteral feeding under the SOP guidelines, Mot. Prelim. Inj. 31, Rabbani fails to demonstrate that he or any other Guantanamo Bay detainee, for that matter, has been force-fed without first showing symptoms of great bodily harm. *Cf* Opp'n Ex. 7 at ¶¶ 4-7 (Commander details the deterioration of Rabbani's medical condition, due to his hunger strike, up to the point of his first involuntary enteral feeding). Thus, Rabbani cannot show a likelihood of success on the merits with a claim that the SOP does not satisfy the deferential *Turner* standard.

to prisoners. *E.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators . . . ."); *Amatel*, 156 F.3d at 204 ("[C]ourts must give a large measure of deference to the prison administrators who are actively involved in the daily operations of the institution."); *see also Beard v. Banks*, 548 U.S. 521, 530 (2006) (At the summary judgment stage, the Supreme Court noted that it "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, [the Court's] inferences must accord deference to the views of prison authorities."). In fact, the Circuit has made clear that Guantanamo Bay administrators, in particular, must be afforded great deference under *Turner*. *See Hatim*, 760 F.3d at 58-60; *see also Munaf v. Geren*, 553 U.S. 674, 689 (2008) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." (internal quotation marks and citation omitted)).

Even when considering the three remaining *Turner* factors, Rabbani's claim fails in the balance. The second factor asks whether Rabbani has alternative means of exercising his right to refuse unwanted force-feedings. *Turner*, 482 U.S. at 90. One plain alternative for Rabbani to avoid involuntary enteral feeding is to voluntarily eat. The Court does not make this point glibly; nor does it seek to remark on the reasons why a detainee who has been held without charge for ten years would protest such a detention. However, under the considerations of *Turner*, ending his hunger strike represents an unmistakable alternative avenue for Rabbani to exercise any right he may have to avoid unwanted force-feedings. *See id.* ("Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" (internal quotation marks and citations omitted)).

11

Regarding the third factor, while the government may argue that any alterations to its current force-feeding policy would endanger its legitimate interest in preserving the lives of detainees and call into question its authority over security decisions at Guantanamo Bay, it is not obvious to the Court that accommodating more of Rabbani's requests to avoid force-feeding would meaningfully exert the resources of the prison. Yet regardless of how the Court would resolve the third factor, the first, second, and fourth factors militate in favor of the government.

The fourth factor—whether there are "ready alternatives" to the force-feeding practices—is a focal point of Rabbani's argument that the *manner* in which he is force-fed is constitutionally unlawful. *See, e.g.*, Mot. Prelim. Inj. 32-34; Notification 4. Rabbani wishes to narrow the final *Turner* factor to evaluating whether there are ready alternatives to a number of the *individual steps* that make up the force-feeding process. But again, the Court finds that *Turner* governs whether force-feeding *generally* infringes on a constitutional right to be free from unwanted medical treatment. Consequently, the question is whether there are "obvious, easy alternatives" to force-feeding in order to nourish a hunger-striking detainee, not whether there are alternative means for each procedure employed by the government as part of the force-feeding process. *See Turner*, 482 U.S. at 90. In evaluating this case for its likelihood of success on the merits, the Court perceives no ready alternatives to force-feeding when an inmate is voluntarily starving himself and nourishment is the only way to keep him alive.

Thus, as with the deliberate indifference standard, analysis under *Turner*'s reasonably related standard prevents Rabbani from demonstrating a likelihood of success on the merits.[7]

---

[7] As noted above, *supra* n.1, Judge Kessler did not decide the dispute concerning final authority to allow force-feeding under the deliberate indifference standard, but rather by simply evaluating whether Dhiab demonstrated a likelihood of success on the merits. Rabbani similarly claims that "the Guantánamo Bay protocols vest the [Guantanamo Bay] Commander"—and not a physician—"with the authority to decide whether to force-feed a[] [detainee]." Mot. Prelim. Inj. 33. Based on the record in this case, the Court agrees with—and adopts—Judge Kessler's finding that the petitioner "simply misreads the regulations governing enteral feeding," and that "the recommendation for enteral feeding must originate with a physician or physician's assistant and must be approved

## B. Forced Cell Extractions

Rabbani also argues that the forcible removal of detainees from their cells to the force-feeding location is unlawful under either *Turner* or *Estelle*. *See* Mot. Prelim. Inj. 5, 41; Notification 7-8. The Court finds that such a claim is highly unlikely to succeed on the merits.

Rabbani accepts the premise that force-feeding is lawful if a detainee is at imminent risk of death or great bodily harm. Mot. Prelim. Inj. 2, 41; Notification 4. If such an imminent risk is present, then, Guantanmo Bay guards must be permitted to physically move an *uncooperative* hunger-striking detainee from his cell in order to be fed in a medically approved location. Rabbani attempts to characterize the so-called Forced Cell Extractions ("FCEs") as unlawfully "routine and indiscriminate," Notification 7, while also conceding that FCEs occur because he refuses to leave his cell voluntarily for mandated force-feedings, Mot. Prelim. Inj. at 5.[8] Thus, FCEs are *not* "indiscriminate," but rather are carried out for a very specific purpose: extracting a recalcitrant detainee from his cell for force-feedings that are deemed medically necessary. And FCEs can only be considered "routine" because the petitioner was routinely uncooperative. In fact, the Bureau of Prisons regulations that the petitioner cites, ostensibly to support his position, are *consistent* with the Guantanamo Bay SOP he cites for his claim that FCEs are "indiscriminate." *Compare* 28 C.F.R. § 552.22(a), (c), *with Dhiab*, No. 05 Civ. 1457, ECF No. 350, Ex. 19A (JDG Procedure #38, May 15, 2014, §§ 38-6(i)(3)(a)-(b), 38-7(b)). Both effectively maintain that staff should "first attempt to gain the inmate's voluntary cooperation before using force," and that a noncompliant detainee "will be secured in his cell using the

---

by the Senior Medical Officer . . . ." *Dhiab*, 2014 WL 5795483, at *8-9; *e g*, Opp'n Ex. 2 at 2 ¶ C, 5 ¶ L.

[8] By stating that "[h]e now attempts to walk to the force-feedings," Mot. Prelim. Inj. 5, Rabbani clearly implies that he had previously refused to walk voluntarily to his force-feedings. And while the fact that Rabbani now walks to the force-feedings may render his FCE claim moot, the Court will resolve the issue under the assumption that Rabbani still occasionally experiences FCEs for his force-feedings

minimum amount of force necessary." 28 C.F.R. § 552.22(a), (c) (further noting that "[s]ituations when an appropriate amount of force may be warranted include, but are not limited to: . . . (2) Enforcement of institutional regulations"); JDG Procedure #38, § 38-7(b).[9]

Accordingly, the Court is unconvinced that Guantanamo Bay guards exceed their authority by forcibly extracting a detainee who is deemed by medical staff to require enteral feeding and refuses to leave his cell on his own accord. The Court concludes that FCEs fall squarely within the discretionary decisionmaking that case law grants Guantanamo Bay staff under either *Estelle* or *Turner*. That Rabbani experienced pain when, upon refusing to walk voluntarily to the force-feeding location, Guantanamo Bay guards "truss[ed] him . . . under full restraint" and "carr[ied] his immobilized body away for force-feeding" is inadequate evidence to demonstrate *deliberate indifference* by the guards. A highly physical encounter[10] between guards and a noncompliant or combative detainee, as required by Guantanamo Bay standard operating procedure, does not illustrate an "unnecessary and wanton infliction of pain." See *Estelle*, 429 U.S. at 104. After all, it was Rabbani's defiance that necessitated the physical nature of his extraction.

Regarding the applicability of *Turner* to the FCE claim, Rabbani does not put forth a specific constitutional right—other than insinuating an Eighth Amendment violation—that FCEs allegedly contravene. However, even if FCEs impinge a specific constitutional right, they are

---

[9] Moreover, there is nothing indiscriminate about the Guantanamo Bay procedure outlined in JDG Procedure #38. A Guantanamo Bay guard "inform[s] the detainee that he must be enterally fed and must leave the cell for that purpose." JDG Procedure #38, § 38-6(i)(3)(a). If the detainee refuses *twice*, the guard notifies the Joint Operations Center. *Id.* Only after receiving approval from the Commander of the Joint Task Force may the guards employ an FCE team to forcibly remove the detainee from his cell and bring him to the force-feeding location. *Id.* at § 38-6(i)(3)(b). Such a procedure, which includes at least two opportunities for a detainee to act voluntarily and requires clearance from a supervisor before force is used, strikes the Court as amply reasonable.

[10] Rabbani describes the encounter as follows: "The soldiers rush the detainee's cell, force him onto the concrete floor, shackle his hands painfully behind his back, shackle his legs, and then carry his body to where he will be force-fed." Mot. Prelim. Inj. 5.

14

reasonably related to legitimate penological interests, such as prison security, *Hatim*, 760 F.3d at 59, and preserving the lives of detainees, *Aamer*, 742 F.3d at 1040-41. Rabbani's emphasis on the fact that Guantanamo Bay guards do not actively pursue alternative means of extraction misinterprets the requirements under *Turner*. *See* Notification 7. There is no constitutional obligation for Guantanamo Bay protocols to "mandate the consideration of 'ready alternatives'" to FCEs for controlling uncooperative detainees. *See id.* "[*Turner*] is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating [Rabbani]'s constitutional complaint." *Turner*, 482 U.S. at 90-91 (citing *Block v. Rutherford*, 468 U.S. 576, 587 (1984)); *cf. Overton*, 539 U.S. at 132 ("The burden . . . is not on the [government] to prove the validity of prison regulations but on the prisoner to disprove it."). While "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable," there are no such obvious, easy alternative means for transporting a noncompliant detainee to the force-feeding location that are readily apparent to the Court. *Id.* at 90. Furthermore, even if ready alternatives to FCEs existed, such a finding would surely not offset the three other *Turner* factors, all of which weigh against Rabbani.[11] Thus, Rabbani's FCE claim is unlikely to succeed on the merits, and must be denied at the preliminary injunction stage.

### C. Rabbani's Status Report Filed December 16, 2014

In a status report filed on December 16, 2014, Rabbani notes a "serious downturn in the state of his health." Status Report 2, ECF No. 346. Rabbani then seeks to link his ailments to the prior use of olive oil as a lubricant on force-feeding tubes—a practice that persisted until the

---

[11] There is a valid, rational connection between FCEs for uncooperative detainees and the legitimate government interests in prison safety and preserving the detainees' lives; as an alternative means of avoiding FCEs, Rabbani could walk voluntarily to the force-feeding location; and accommodating Rabbani's request to enjoin such forcible removals from his cell, Mot. Prelim. Inj. 41, would undoubtedly burden Guantanamo Bay guards' ability to "preserv[e] institutional order." *See Turner*, 482 U.S. at 90-91.

15

summer of 2014. *Id.* at 2. According to Dr. Steven Miles, who submitted a declaration as part of Dhiab's motion for a preliminary injunction, such a use of olive oil can potentially "cause a condition called lipoid pneumonia." Mot. Disc. Ex. A ¶ 10, *Dhiab*, June 20, 2014, ECF No. 265-1. Rabbani asserts that the government rejected his request that the medical staff at Guantanamo Bay test him for lipoid pneumonia. *Id.* at 3-4. Rabbani argues that the government's refusal "presents an additional issue for this Court's decision: whether that refusal meets the 'deliberate indifference' standard of proof set forth in *Estelle* . . . ." *Id.* at 4. The status report is fashioned as an addendum to the petitioner's previously filed motion for a preliminary injunction, and not as a new motion. As such, the Court need not consider this question until Rabbani includes it in a separate motion or moves to amend his original motion for a preliminary injunction. However, for the sake of completeness, the Court finds that the government's "refusal" to test Rabbani for lipoid pneumonia does not constitute deliberate indifference.

Petitioner's status report merely presents an example of different medical opinions, not deliberate indifference on the part of the government. The government avers that "(1) a standard chest x-ray taken of Petitioner in August 2014 for routine tuberculosis screening had shown no signs of pneumonia or other lung infection, and (2) Petitioner had not reported any respiratory complaints for the past several months." Status Report at 3. The fact that Rabbani can point to a medical journal article stating that "(1) more than half of persons with lipoid pneumonia are asymptomatic, (2) chest x-rays have a relatively low rate of diagnostic accuracy for lipoid pneumonia, and (3) there are much more accurate tests for diagnosing lipoid pneumonia," *id.* at 4, does not transform the government's medical decision not to test Rabbani into deliberate indifference. There is no evidence, explicit or implicit, from the communications between

Rabbani's counsel and the government, *id.* Ex. C, that the Guantanamo Bay medical staff "possesse[s] a . . . culpable state of mind" sufficient for the Court to find that their decision not to perform further testing on the asymptomatic petitioner equates to cruel and unusual punishment. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).[12]

Additionally, the link Rabbani attempts to draw between the government's prior use of olive oil to lubricate force-feeding tubes—which creates the basis for his argument of deliberate indifference as to lipoid pneumonia testing—and his medical condition is, at best, speculative. Rabbani seeks to blame the government's use of olive oil during the force-feeding process for his current medical problems, and, thus, create the sense that a pattern of government neglect, or worse, exists. While substantive evidence that the government has engaged in a pattern of "reckless" medical practices may provide additional support for a claim that the government's refusal to test for lipoid pneumonia reflects deliberate indifference, Rabbani can demonstrate no such pattern here. Indeed, there appear to be multiple alternative explanations for the petitioner's worrisome condition: namely, Rabbani's nearly two-year-long hunger strike, or, perhaps even his voluntary consumption of olive oil "separate from the enteral feeding" process, Opp'n Ex. 7 ¶ 10. Therefore, without credible evidence of prior government deliberate indifference as to his medical issues, Rabbani's already tenuous claim that the government's rejection of his request for testing meets the *Estelle* standard rests on even shakier grounds, and is insufficient to satisfy the petitioner's lofty burden for a showing of deliberate indifference. *See Estelle*, 429 U.S. at 105-06 (a finding of deliberate indifference must be consistent with a finding of "an unnecessary and wanton infliction of pain").

---

[12] The Court also notes that the petitioner provides no evidence that the Guantanamo Bay facility even possesses the resources to conduct the purportedly "more accurate tests for diagnosing lipoid pneumonia (e.g., high resolution computed tomography or bronchoscopy with bronchoaveolar lavage)." *See id*

Thus, for the foregoing reasons, the Court DENIES the petitioner's motion for a preliminary injunction.

A separate Order consistent with this Memorandum Opinion shall issue this date.

12/19/14
Date

ROYCE C. LAMBERTH
United States District Judge