~~FILED UNDER SEAL~~
~~CONTAINS PROTECTED INFORMATION~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AHMMED GHULAM RABBANI, | § | |
| | § | |
| PETITIONER, | § | |
| | § | |
| v. | § | |
| | § | No. 1:05-cv-01607-RCL |
| DONALD J. TRUMP, et al. | § | |
| | § | |
| RESPONDENTS. | § | |

**Memorandum Opinion:**
**Denying Petitioner's Emergency Motion for an Independent Medical Evaluation**
**and Treatment and Medical Records**

### Summary

The petitioner, Ahmmed Ghulam Rabbani, is a detainee at the U.S. naval station at Guantanamo Bay. He has been on hunger strike for four of the last thirteen years. There is some question as to whether or not the petitioner is currently hunger striking,[1] but the Court will, for the most part, assume that his hunger strike continues to this day. For much of the time during which he was hunger striking, the petitioner was subjected to involuntary enteral feedings (force-feedings). In September 2017, the new Senior Medical Officer (SMO) of the Joint Medical Group (JMG) at Guantanamo Bay determined that the petitioner no longer needed these involuntary feedings and ordered that they cease. The petitioner argues that this course of action threatens his life and constitutes deliberate indifference to his serious medical needs in violation of his Eighth

---

[1] In its most recent filing, the Senior Medical Officer (SMO) at Guantanamo Bay related to the Court that the petitioner told him that he (the petitioner) was not on a hunger strike anymore. (ECF #376-1 ¶10). But neither the petitioner nor his counsel have confirmed or denied this representation.

~~FILED UNDER SEAL~~
~~CONTAINS PROTECTED INFORMATION~~

1

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

Amendment right to be free from cruel and unusual punishment as set forth in *Estelle v. Gamble*,

429 U.S. 97 (1976).

The petitioner has now filed an emergency motion for a preliminary injunction seeking

the following relief under either the doctrine of *Estelle* and its progeny or pursuant to the All Writs

Act, 28 U.S.C. § 1651(a):

(1) The production of his physical and mental records since July 2017;

(2) A medical evaluation to be performed by a medical examiner chosen by the petitioner's counsel;

(3) An order directing that the petitioner's chosen medical examiner be permitted to provide the petitioner with any medical treatment the examiner deems necessary and appropriate and that the medical staff at Guantanamo Bay facilitate that treatment;

(4) The production of daily reports about the petitioner's physical and mental health;

(5) An order requiring the respondents to follow procedures governing medical care provided to hunger-striking detainees that the petitioner alleges were in place prior to September 20, 2017—i.e., that the medical staff at Guantanamo Bay resume force-feeding the petitioner;

(6) An expedited briefing schedule.

Having reviewed all of the briefings and exhibits submitted to it, the Court will **DENY**

the petitioner's motion in its entirety. While the Court finds that the petitioner has a serious

medical condition, the Court also finds that the petitioner is unlikely to be able to show that the

medical staff at Guantanamo has been deliberately indifferent to that condition. Therefore, his

deliberate-indifference claim does not support preliminary injunctive relief. The Court also finds

that relief pursuant to the All Writs Act is inappropriate because the petitioner is not likely to be

able to show that his life and health are in danger such that this Court's jurisdiction is threatened.

### Background

The petitioner, Ahmmed Ghulam Rabbani, is a detainee at the U.S. naval station at

Guantanamo Bay. He has been on hunger strike for four of the last thirteen years. There is some

question as to whether or not the petitioner is currently hunger striking, but the Court will, for the

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

most part, assume that his hunger strike continues to this day. For much of the time during which he was hunger striking, the petitioner was subjected to involuntary enteral feedings (force-feedings).

In September 2017, the new Senior Medical Officer (SMO) of the Joint Medical Group (JMG) at Guantanamo Bay determined that the petitioner no longer needed these involuntary feedings and ordered that they cease. Up to this point, petitioner and the respondents largely agree. But beyond this point, the petitioner and the respondents diverge drastically, offering wholly different accounts of what policies concerning hunger strikers are currently in place at Guantanamo and of the current state of the petitioner's health. So different are these accounts that the Court will provide separate summaries of them.

**I.     The Petitioner's Account**

The petitioner alleges that, as of September 19, 2017, the new SMO at Guantanamo enacted a new policy under which the medical staff would no longer provide any involuntary enteral feedings to hunger strikers, leaving them with only the options of eating normal food or starving to death. In addition, the SMO ordered that the medical staff cease monitoring the hunger strikers, leaving them without any medical care. The petitioner does not wish to end his hunger strike, but he also does not wish to die. Beyond that, the petitioner claims that even if he wanted to end his hunger strike, he could not do so because he is entirely unable to eat normal food because it would cause him to vomit and because he suffers from bleeding, indigestion, colon problems, ulcers, and other ailments. As such, the petitioner asserts that the end of involuntary feedings is, for him, a death sentence. He cannot eat, and so he must receive involuntary feedings or die.

The petitioner alleges that his weight as of September 19, 2017, was 103 pounds. By September 26, he weighed a mere 97 pounds. He alleges that he has signs of organ failure. He

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

3

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

alleges that he has fallen down and lost muscle control on many occasions. He says that he suffers from heart arrhythmia, insomnia, hypertension, and chronic mental health issues. In short, the petitioner alleges that without immediate injunctive relieve he will soon be dead.

The petitioner argues that this course of action threatens his life and constitutes deliberate indifference to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment as set forth in *Estelle v. Gamble*, 429 U.S. 97 (1976). As such he has filed an emergency motion for a preliminary injunction seeking the following relief under either the doctrine of *Estelle* and its progeny or pursuant to the All Writs Act, 28 U.S.C. § 1651(a):

(1) The production of his physical and mental records since July 2017;

(2) A medical evaluation to be performed by a medical examiner chosen by the petitioner's counsel;

(3) An order directing that the petitioner's chosen medical examiner be permitted to provide the petitioner with any medical treatment the examiner deems necessary and appropriate and that the medical staff at Guantanamo Bay facilitate that treatment;

(4) The production of daily reports about the petitioner's physical and mental health;

(5) An order requiring the respondents to follow procedures governing medical care provided to hunger-striking detainees that the petitioner alleges were in place prior to September 20, 2017—i.e., that the medical staff at Guantanamo Bay resume force-feeding the petitioner;

(6) An expedited briefing schedule.

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

## II.   The Government's Account



The petitioner was one of the detainees whose status on the list was reviewed. In this review, the SMO noted that the petitioner's weight had been relatively stable at around 102 pounds for the past year (October 2016 – October 2017). The SMO also noted that the petitioner had been observed eating solid food on a daily basis (despite his claims of being on a hunger strike) and making smoothies for himself. The SMO estimated that the petitioner's daily caloric intake was approximately 1200 kilocalories per day. The SMO also noted that (contrary to the petitioner's assertions) the petitioner was physically and mentally active—climbing stairs; walking unassisted; participating in recreational time; engaging in conversation with the SMO, behavioral health unit staff, and others; etc.

Based on all of these observations, the SMO determined that the petitioner was not malnourished and that involuntary feedings were no longer necessary to prevent death or serious harm to the petitioner. Therefore, the petitioner was removed from the list of detainees approved for involuntary feedings.

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

The Government also denies that medical monitoring of the petitioner ceased once the involuntary feedings ceased. According to the SMO, the petitioner was, after his removal from the list, at a minimum given daily visual evaluations by medical staff. The Government also claims that it offered the petitioner with specific medical procedures tailored to his medical needs, such as endoscopic examinations of his colon. But the Government asserts that the petitioner refused all medical care offered to him, including dental care, gastroenterology evaluations, and even the provision of vitamins. After the petitioner filed his motion, though, the petitioner was examined by medical staff. The Government claims that this examination showed no evidence of any of the physical ailments of which the petitioner and his counsel alleged the petitioner suffered.

In short, as of the time of its initial response, the Government asserted that the petitioner was underweight, but otherwise healthy.

But the petitioner's condition deteriorated in the time after the Government filed its response. In a supplemental declaration, the Government informed the Court that it had placed the petitioner back on the list of detainees approved for involuntary enteral feedings. According to the Government, between October 13, 2017, and November 13, 2017, the petitioner's weight dropped from 102.4 pounds to 97.8 pounds. This dramatic weight loss resulted in the petitioner being approved for an involuntary feeding, which he received on November 14. The Government asserts that the petitioner has received no more involuntary feedings because, since that time, the petitioner has "compliantly drunk his prescribed nutritional supplement twice daily, thereby obviating the need for involuntary enteral feeding." (ECF #376 at 2). The Government further asserts that while the petitioner has resumed consuming food, his weight has still dropped some, with the petitioner weighing 96.2 pounds as of November 17, 2017 (the most recent date for which

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

the Court has data). Otherwise, however, the Government claims that the petitioner is in stable condition.

### III.   The Court Believes the Government's Account.

As the petitioner notes in his reply, the stark contrast between the facts alleged in the petitioner's counsel's affidavits and those alleged by the Government require the Court to make a choice as to whom to believe. The Court credits the statements of the Government over those of the petitioner and his counsel. The Government's representations are based on the affidavits of the JMG and the SMO. The JMG consists of trained medical professionals who have daily interactions with the petitioner. The JMG's and SMO's affidavits are thorough and detailed. They make note of what is bad about the petitioner's health in addition to what is good. The petitioner's counsel's affidavits, meanwhile, are borderline apocalyptic and not based on regular interactions between the petition and a medical professional. The Court does not doubt that the petitioner's counsel and expert psychiatrist are well-intentioned, but the JMG and SMO are in a much better position from which to evaluate the petitioner, take accurate measurements of his weight and other vital signs, and observe his daily doings. In addition, the JMG and SMO have a better understanding of the policies and decisions that govern the goings-on at Guantanamo. It is understandable that the petitioner may misinterpret the decision to remove him and others from the list of persons approved for involuntary feedings as a complete stop of the program because the petitioner likely would not have access to the full decision-making process. For these reasons, the Court believes the factual account given by the Government.

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

## Legal Standards

### I.  Preliminary Injunctions

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." (*Id.* at 20). By far the most important of these factors is the first. (*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). If the plaintiff/petitioner cannot satisfy the first factor and show a likelihood of success on the merits, then it is not even necessary to consider the other factors—the preliminary injunction will be denied. (*Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011)).

Courts in the D.C. Circuit have distinguished between preliminary injunctions that seek to maintain the *status quo* and preliminary injunctions that seek to alter the *status quo*. Specifically, when a preliminary injunction that would change the *status quo* is sought, "the moving party must meet a high standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." (*Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013)).

### II.  Deliberate Indifference to the Serious Medical Needs of Detainees

In *Estelle v. Gamble*, the Supreme Court concluded "that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

proscribed by the Eighth Amendment." (429 U.S. 97, 104 (internal quotations and citations omitted)). The test for establishing that this standard has been violated consists of two parts.

First, the petitioner must establish that his medical condition is "objectively, sufficiently serious." (*Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Such a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." (*Nielsen v. Rabin*, 746 F.3d 58, 66 (2d Cir. 2014) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994))).

Second, the petitioner must establish that the medical officers had the requisite, culpable state of mind—deliberate indifference. This deliberate-indifference state of mind requires more than a mere showing of medical malpractice or neglect. (*Estelle*, 429 U.S. at 105–06 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008)). Rather, it is equivalent to "subjective recklessness as used in the criminal law." (*Farmer*, 511 U.S. at 834, 839 (1994)). As such, the detaining authority or treating physician can violate the petitioner's constitutional rights "only if he knows that [the petitioner] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." (*Id.* at 847). And finally, courts are less likely to find that there has been deliberate indifference to a serious medical need when that medical need is the result of or exacerbated by the petitioner's voluntary decisions. (*See Brown v. Graham*, No. 07-cv-1353, 2010 WL 9428251 at *13 n.31 (N.D.N.Y. Mar. 30, 2010) (finding that the "fact that plaintiff risked undermining his health by conducting a voluntary hunger strike undercuts his claim of deliberate indifference to serious medical needs" and listing other cases that reached the same conclusion); *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) (reasoning

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

that a prisoner cannot be permitted to "engineer" an Eighth Amendment violation by willingly

going on hunger strike and then blaming his captors when the foreseeable medical complications

arise)).

## III. The All Writs Act

The All Writs Act, 28 U.S.C. § 1651(a), grants to all courts created by Congress the

power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and

agreeable to the usages and principles of law." To be clear, the All Writs Act does not itself create

or expand a court's jurisdiction, it only grants to a court power "in aid of" protecting the court's

existing jurisdiction. (*Clinton v. Goldsmith*, 526 U.S. 529, 534–36 (1999)). But just because a

writ may be legitimately "in aid of" a court's existing jurisdiction does not mean that the court

may issue that writ under the All Writs Act. Rather, the All Writs Act only authorizes the issuance

of writs that are "agreeable to the usages and principles of law." (28 U.S.C. § 1651(a)).

Determining whether a particular writ is "agreeable to the usages and principles of law" requires

a court to examine the common law and other "usages and principles" that have constrained the

issuance of such writs "down through the years." (*Jones v. Lilly*, 37 F.3d 964, 968 (3d Cir. 1994);

*Rawlins v. Kansas*, 714 F.3d 1189, 1196 (10th Cir. 2013)).

The All Writs Act is a non-preferred remedy. Writs issued under the Act are considered

"extraordinary measures," so if there are adequate, alternative remedies at law or other measures

that a court may take to resolve an issue without resorting to a writ, then a writ ought not be

granted. (*See Goldsmith*, 526 U.S. at 537; *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359

(11th Cir. 1978)). Despite providing an extraordinary remedy, courts have expressly recognized

that the All Writs Act has a role to play in the habeas context. Accordingly, the Act permits a

court "to enjoin almost any conduct which, left unchecked, would have . . . the practical effect of

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

UNCLASSIFIED//FOR PUBLIC RELEASE

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

diminishing the court's power to bring the litigation to a natural conclusion." (*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004) (internal quotation omitted); *see also Ala. Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218 (1906) (federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties . . . of the protection of their rights" in the federal courts)). Such concerns are especially acute when the harm to a court's jurisdiction over the detainee may arise from the death or incapacitation of the detainee.

## Analysis

I.      **The Petitioner Is Not Likely to Prevail on the Merits of His Claims Under Either the "Deliberate Indifference to Serious Medical Needs" Standard or the All Writs Act.**

### A. Deliberate Indifference to Serious Medical Needs

The petitioner is unlikely to prevail on the merits of showing that the medical staff at Guantanamo has been deliberately indifferent to his serious medical needs. The Court finds that although the petitioner does have a serious (though self-inflicted) serious medical need, there is no reliable evidence to support the contention that the medical staff has been indifferent to that need, deliberately or otherwise.

#### 1. The Petitioner Has a Medical Condition that Is Objectively, Sufficiently Serious.

First, the Court finds that the petitioner's weight loss, already low body weight, and probable malnutrition (though mostly caused by his own hunger strike), in addition to possible, undiagnosed comorbidities, constitute an objectively, sufficiently serious medical need. Though the petitioner and the Government disagree as to almost every particular regarding the petitioner's health (as described in detail above), the Court finds that the Government's "Supplemental

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

11

UNCLASSIFIED//FOR PUBLIC RELEASE

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

Declaration of the JTF-GTMO Senior Medical Officer Addressing Petitioner Rabbani's Current

Health and Enteral Feeding Status" essentially concedes this point. (ECF #376; ECF #376-1).

        In the Supplemental Declaration, the SMO informed the Court that on November 13,

2017, he "recommended Mr. Rabbani for involuntary enteral feeding because immediate treatment

was necessary to prevent death or serious harm." (ECF #376-1 ¶4). According to the SMO, on

November 13 the petitioner weighed 97.8 pounds, 4.6 fewer pounds than he weighed one month

earlier. (*Id.* ¶5). This weight loss represents a 4.5% decrease in body weight in 30 days. And

while the petitioner remained physically active, the SMO observed a marked decrease in the

petitioner's facial fat and a change in the prominence of the petitioner's shoulder blades that

indicated a further loss of muscle mass. (*Id.*). Based on these observations, the SMO concluded

that the petitioner "now had a medical indication for an involuntary medical procedure to prevent

death or serious harm." (*Id.*). If, as the SMO says, the petitioner was at risk of death or serious

harm, it can hardly be denied that the petitioner's health was in "a condition of urgency, one that

may produce death, degeneration, or extreme pain." (*Nielsen*, 746 F.3d at 66).

        The petitioner was enterally fed only once following the SMO's recommendation that

he be approved for involuntary feedings, and that feeding occurred on November 14, 2017. (ECF

#376-1 ¶6). According to the SMO's Supplemental Declaration, which the Court finds credible,

the petitioner has since that time compliantly consumed Ensure Plus in accordance with the JMG's

recommendations and has also (according to the guards at Guantanamo) eaten other food of his

own accord. (*Id.* ¶¶7, 10).

        But this does not change the Court's determination that the petitioner is suffering from

an objectively, sufficiently serious medical condition. The petitioner's weight as of November 17,

2017 (the most recent weight provided to the Court by the SMO) was 96.2 pounds, even lower

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

than it was a few days earlier when the SMO recommended the petitioner for involuntary feedings. (*Id.* ¶10). In addition, the petitioner is anemic, has abnormal electrolytes, and remains at risk of malnutrition.[2] (*Id.* ¶¶8–10). The SMO himself states that once the petitioner "no longer has a medical indication for involuntary enteral feeding, [the SMO] will request that the current authorization for involuntary enteral feeding be revoked," implying that the petitioner's health is still sufficiently at risk to justify involuntary feedings should he cease willingly to consume nutrition. (*Id.* ¶11). And lastly, the SMO states that he is "concerned about the possibility of an underlying, incompletely differentiated medical problem unrelated to his protest but possibly contributing to his successful ability to lose weight." (*Id.* ¶12). In light of the petitioner's continued eligibility for involuntary feeding and the possibility of comorbidities, the Court concludes that the petitioner does have an objectively, sufficiently serious medical condition as contemplated by *Estelle* and its progeny.

## 2. The SMO and JMG at Guantanamo Have Not Been Deliberately Indifferent to the Petitioner's Serious Medical Needs.

Having established that he has a serious medical condition, the petitioner must now show that those in charge of his medical care at Guantanamo have been deliberately indifferent to his medical needs. This the petitioner fails to do.

The petitioner alleges that on September 19, 2017, the SMO had "ordered that medical staff forego . . . long-standing policy and stop force-feeding the hunger strikers and cease the

---

[2] Concerning the risk of malnutrition, the SMO says that the petitioner "demonstrates physical signs of malnutrition without biochemical evidence of malnutrition." (ECF #276-1 ¶11). But the SMO also notes that "some biochemical markers [of malnutrition] are influenced by hydration status and can be 'falsely normal.'" (*Id.* ¶8). Given the petitioner's dehydration, then, the Court is not willing to rule out malnutrition. To be clear, the Court is not questioning the medical judgment of the SMO, who also notes that the petitioner bears some indications of malnutrition; the Court is only saying that for purposes of the threshold determination of whether there is an objectively, sufficiently serious medical need, the Court takes the possibility of a "false normal" seriously.

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

medical monitoring of their now rapidly declining health." (ECF #363-1 at 2). As characterized

by the petitioner, this new policy was absolute—no more force-feedings—and demonstrated that

the SMO and JMG were "no longer interested in preserving their health, or even their lives,

regardless of the hunger strikers' wishes." (*Id.* at 7). This policy was enacted, according to the

petitioner, "to coerce him to stop his peaceful strike." (*Id.* at 9). Even when he requested a force-

feeding, the SMO refused it, stating that any harm he suffered as a result was his "own choice."

(*Id.* at 7). The petitioner asserts that the JMG ceased to take his weight on a daily basis or to

provide medical observation and also denied him medical care generally.

The Government's response reveals a much more nuanced situation than the

petitioner's characterization.

The petitioner was one of the detainees whose status on the list was reviewed. In this

review, the SMO noted that the petitioner's weight had been relatively stable at around 102 pounds

for the past year (October 2016 – October 2017). Although this is significantly below the

petitioner's ideal weight of 129–135 pounds, the SMO noted that "when a detainee has lived long

term in a state of undernutrition (low body weight), the body makes adjustments to live at that

weight and the weight alone is no longer an indicator of malnourishment." (ECF #368-2 ¶15).

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

More important than the weight itself, then, are "[t]rends in the baseline weight (usual bodyweight)," which is defined as "the weight over the preceding 12 months." (*Id.*). Essentially, the frame of reference for determining what is an acceptable weight for the detainee changes over time. Therefore, it became much less important that the petitioner's intake weight was 129 pounds and much more important that his weight had remained relatively stable for more than a year.

In that review, the SMO also noted that the petitioner had been observed eating solid food on a daily basis (despite his claims of being on a hunger strike) and making smoothies for himself. (*Id.* ¶13). The SMO estimated that the petitioner's daily caloric intake was approximately 1200 kilocalories per day. (*Id.* ¶17). The SMO also noted that (contrary to the petitioner's assertions) the petitioner was physically and mentally active—climbing stairs; walking unassisted; participating in recreational time; engaging in conversation with the SMO, behavioral health unit staff, and others; etc. (*Id.* ¶¶ 14, 16–17).

Based on the petitioner's stable weight, observed and estimated caloric intake, physical and mental activity, and other indicators, the SMO determined that involuntary feedings were no longer necessary to prevent death or serious harm to the petitioner. (*Id.* at 16–17). The SMO found that "other than his low weight, [the petitioner did] not show any medical signs that would support the continuation of enteral feeding" in September 2017. (ECF #368 at 15). The SMO concluded that the petitioner was not malnourished and that he had no known medical condition that even required daily monitoring. (*Id.*). Therefore, the petitioner was removed from the list of detainees approved for involuntary feedings. (ECF #368-2 ¶¶ 16–17).

As such, the initial decision to stop force-feeding the petitioner was not made with indifference to his health, but was rather an informed decision made by an attentive medical care provider. The petitioner may not have liked that determination, but the petitioner's treatment

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

preferences are largely irrelevant to this analysis. (*Estelle*, 429 U.S. at 107 ("But the question whether [certain] forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (finding that a prisoner has no right to the specific "type or scope of medical care which he personally desires")).

Also baseless are the petitioner's claims that he was refused medical care generally. According to the SMO, the petitioner was, after his removal from the list, visually examined on a daily basis by the JMG and could receive physical examinations if he wanted. (ECF #368-1 ¶14). But the petitioner did not want physical examinations or any other medical care. In fact, the petitioner actively refused all medical care in the period following his removal from the list, including dental care, gastroenterology evaluations, and even the provision of vitamins. (ECF #368-2 ¶¶ 16, 19). What the Court faces is a situation in which a detainee refuses to participate in his own healthcare, turns down repeated offers of care, and then claims medical neglect. The petitioner cannot artificially manufacture a deliberate indifference claim in this manner.

Further reinforcing the Court's conclusion is the fact that, after the petitioner filed his motion, the JMG conducted a medical examination of the petitioner. In that review, the JMG found no evidence that the physical issues enumerated in the petitioner's counsel's affidavits existed at the time. (ECF #368 at 17). The SMO also informed the Court that, per standard medical procedures, the petitioner would continue to be examined and that he would be reconsidered for involuntary feeding if "his physical appearance combined with his weight or other factors suggested malnourishment." (ECF #368-1 ¶14). That is exactly what happened. When the petitioner's weight dropped significantly the second month after his involuntary feedings stopped,

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

he was reconsidered and reapproved for involuntary feedings. (ECF #376 at 2). These are not the actions of a callous and indifferent medical corps. Rather, the JMG has performed as attentive and responsible medical professionals should.

Finally, the Court turns to the SMO's "quip" that any harm befalling the petitioner following the cessation of the involuntary feedings was the petitioner's "own choice." The petitioner makes much of this statement in his briefs, arguing that it shows the deliberate indifference with which the SMO and the JMG in general regard the petitioner's life and health. The Court does not agree. The policy of the JMG is to approve a detainee for involuntary feedings only when "medically necessary to prevent death or serious harm." (ECF #368-2 ¶13). Implicit in this standard is the realization that there are harms that can result from a hunger strike that do not rise to the level of a risk of death or serious harm. These we allow a detainee to suffer. Only once a hunger striker is at risk of death or serious harm must the SMO and JMG intervene and perform involuntary enteral feedings. When exactly this time arrives and when it ends is a medical determination requiring a "comprehensive, multi-factor evaluation of the detainee's health" as described above. (ECF #368 at 13). Detainees are never happy with the determination no matter the result. Detainees have sued challenging the determination that they were at risk of death or serious harm. (*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)). Detainees have sued challenging the manner of force-feeding after a determination. (*Id.*). And now a detainee sues challenging the determination that he was not at risk of death or serious harm. In light of this, the Court interprets the SMO's statement not to reflect deliberate indifference to the life and health of the petitioner. Rather, the statement, if indeed it was made, was more likely an acknowledgment that our system tolerates a certain amount of suffering on the part of detainees who voluntarily bring it upon themselves.

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

Having considered all of the affidavits and other evidence before it, the Court finds no evidence that could support a finding that the SMO and JMG have been deliberately indifferent to the petitioner's serious medical needs. Instead, the Court finds that the SMO and JMG have been remarkably attentive to the patient's needs and careful in their attempts to balance the petitioner's right to engage in a hunger strike with the need to preserve the petitioner's life. For these reasons, the plaintiff is unlikely to show that he will succeed on the merits of his deliberate-indifference claim.

### B. The All Writs Act

The petitioner's argument concerning the All Writs Act is inseparably related to his argument under the deliberate-indifference standard. The petitioner argues that the refusal of the medical staff at Guantanamo to resume involuntary enteral feedings endangers his life and his capacity to interact with his attorneys. If the petitioner dies, this Court will have obvious trouble exercising jurisdiction over his habeas petition. Likewise, if the petitioner's health degrades to the extent that it "impedes the attorney-client relationship" because of fatigue, collapsing, and mental and emotional instability, then his access and ability to participate in habeas proceedings will be impaired. (*See Al-Oshan v. Obama*, F. Supp. 2d 1, 6 (D.D.C. 2010); *Tumani v. Obama*, 598 F. Supp. 2d 67, 70–71 (D.D.C. 2009)).

These arguments would be compelling if the Court, as a factual matter, actually believed that the petitioner was likely to die or become incapacitated in the near future. But as the Court discussed in great detail above, while the petitioner has a serious medical condition, he is also receiving excellent, attentive care. The medical staff at Guantanamo even resumed forced-feedings briefly when the petitioner indicated that it was necessary. Simply put, the Court has full confidence that the medical staff at Guantanamo is doing its job and that, as a factual matter, the

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

plaintiff's life and health are not so threatened as to pose any threat to this Court's jurisdiction over him.

The Court also finds that the relief the petitioner requests is inappropriate given the availability of courses of action short of an extraordinary writ that can protect the patient's life and health. First and foremost, the petitioner can end his hunger strike.[3] Short of that, the petitioner may continue his hunger strike, but stop refusing the other medical procedures that have been offered to him (such as the gastroenterology evaluations that could help the JMG to discover the source of his bloody stools). The point is that many of the risks to the petitioner's life and health are the result of his own choices. If he truly is concerned about preserving this Court's jurisdiction over his habeas petition, he is free to stop placing himself at risk. The Court does not think it appropriate to find that a petitioner may voluntarily pursue a course of action that threatens his own life and then petition for an extraordinary writ commanding someone else to stop him when it looks like he might succeed. The medical staff at Guantanamo has demonstrated that it will not allow the petitioner to die or come to serious harm. The Court will afford to the petitioner no greater relief in the face of his chosen course of action.

## C. Conclusion

For these reasons, the Court finds that the petitioner is unlikely to succeed on the merits of either his deliberate-indifference claim or his claim under the All Writs Act. For this reason alone the Court could deny his motion for a preliminary injunction. But the Court will proceed to analyze the other *Winter* factors for thoroughness.

---

[3] As the Court has previously mentioned, the petitioner may have done so already. (ECF #376-1 ¶10), but without confirmation from the petitioner himself the Court will not assume this to be true.

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

~~FILED UNDER SEAL~~
~~CONTAINS PROTECTED INFORMATION~~

## II.    The Petitioner Does Not Face Irreparable Injury Without Relief.

The harm that the party pursuing a preliminary injunction seeks to prevent may not be speculative or merely possible. Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." ((*Winter*, 555 U.S. at 22) (emphasis in original)). In this case, evaluating whether the petitioner is likely to face irreparable harm without an injunction is inseparably related to the analysis of the merits of the petitioner's claims. The harm that the petitioner alleges is the "imminent danger" that the SMO's chosen course of action represents to the petitioner's health. (ECF #363-1 at 16). As the Court has made clear, the policies and procedures that Guantanamo personnel have in place are sufficient to avoid the catastrophic consequences of which the petitioner warns. Guantanamo personnel have not ceased monitoring the petitioner's health. They have not refused to perform involuntary feedings when they have found it necessary. And the SMO's thorough evaluation of the petitioner's health reveals that the petitioner is "medically stable." (ECF #376-1 ¶11). For these reasons, the Court finds that the petitioner's fears of death and "total organ failure" are overblown. (ECF #363 at 1).

The petitioner's health is stable and likely to remain so. For that reasons the Court finds that the petitioner does not face a risk of irreparable harm without injunctive relief.

## III.    The Balance of the Equities Does Not Favor Granting Injunctive Relief.

The third *Winter* factor requires that the Court balance the equities of the case. (555 U.S. at 20). In this case, the balance of the equities does not favor the petitioner.

The petitioner argues that allowing an independent medical evaluation by a non-military doctor would pose no great burden on the Government. The logistics of the visit itself are easy to arrange, and the requirement that the medical officers at Guantanamo administer any treatments the non-military doctor may suggest is nothing more than "the requirement to provide

~~FILED UNDER SEAL~~
~~CONTAINS PROTECTED INFORMATION~~

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

care to prisoners of war." (ECF 363-1 at 18). This assessment is incorrect. It is indeed easy for a

non-military doctor to fly to Guantanamo. But requiring the medical officers at Guantanamo to

follow the orders of this supposedly independent doctor is much more than "the requirement to

provide care to prisoners of war"—it is a coup that subjects the medical judgment and authority of

the JMG to whatever supposedly neutral physician the petitioner's counsel selects. The Court

agrees with the Government's characterization of the petitioner's requested relief as "nothing short

of a full takeover of Petitioner's medical care by an expert of Petitioner's choosing, as well as

dictation by Petitioner of the procedures at Guantanamo for dealing with hunger-striking detainees

and the requirement that JMG personnel conduct whatever medical procedures that Petitioner's

expert requests." (ECF 368 at 29–30). This goes far beyond the requirement that the United States

provide care to prisoners of war (or, more accurately, to detainees, because the petitioner is not

legally a prisoner of war). Rather, this is an attempt by the petitioner to receive that to which he

has no right, not just medical care, but "the type or scope of medical care which he personally

desires." (*McGinnis*, 429 F.2d at 867). The burden the petitioner's requested relief would impose

on the Government, then, is much higher than the petitioner suggests.

   The general upending of the chain of command among the medical decision-makers at

Guantanamo that the petitioner's requested relief would cause is not the only burden posed to the

Government in this case. Other portions of the petitioner's requested relief present their own

concerns. Of particular concern to the Court is the petitioner's request for the disclosure of

comprehensive daily reports on the petitioner's physical and mental health, which the petitioner

requests to be delivered immediately to counsel even if they contain classified (or potentially

classified) information. A request for a client's medical records is one thing. (*See Al-Joudi v.

Bush*, 406 F. sup. 2d 13, 20 (D.D.C. 2005) (ordering the production of medical records); *Husayn*

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

*v. Gates*, 588 F. Supp. 2d 7, 10–11 (D.D.C. 2008) (same); *Tumani*, 598 F. Supp. 2d at 69–71

(same)).  But a request for comprehensive daily reports with no initial regard to the potentially

classified nature of their contents is another.  Granting this relief would require the medical staff

at Guantanamo to expend an inordinate amount of time tending to a single detainee—and that to a

detainee who has a habit of willfully refusing medical examinations—and would require the

Government to risk the disclosure of classified information unnecessarily.  In this case, the burden

of complying with the petitioner's requests is much higher than would be the case if the petitioner

merely requested a routine disclosure of his medical records to counsel.

Against this burden, the petitioner sets forth his constitutional rights to adequate

medical care and to be free from the "unnecessary and wanton infliction of pain." (ECF #363-1 at

18 (quoting *Estelle*, 429 U.S. at 104)).  But as the Court has already explained, the petitioner is

unlikely to succeed in showing that the Government has deprived him of these constitutional rights.

The balance of the equities, then, is this: on the one hand we have the heavy burden of supplanting

the authority of the medical officers at Guantanamo with the will of physicians selected by the

petitioner's counsel and the administrative burden of comprehensive daily examinations and the

unnecessary disclosure of classified information; and on the other hand we have the petitioner's

health, which is closely monitored by the JMG and is threatened, if at all, by the petitioner's own

choices, and the petitioner's constitutional rights, which he cannot show are being violated.

The equities in this case, then, favor denying the injunction that the petitioner requests.

IV.     **Injunctive Relief Is Not in the Public Interest.**

The petitioner argues that it would harm the national security interests and image of the

United States were he to starve to death.  (ECF #363-1 at 19 (citing *Al-Joudi*, 406 F. Supp. 2d at

20)).  This statement is true on its face; the death of a detainee in American custody resulting from

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

medical neglect would look very bad and certainly would not be in the public interest. But the statement presupposes that the petitioner will—or at least is likely to—be permitted to die as a result of his hunger strike while under the care of the JMG. That is not true. The harms to the United States's national security interests and image of which the petitioner warns will not come about because, as the Court has already explained, the petitioner is receiving competent care from an attentive medical staff that is aware of the petitioner's medical needs and is not disposed to allow the petitioner to wither away and die under its watch.

The JMG's policy of conducting involuntary enteral feedings "when medically necessary to prevent death or serious harm" or when the petitioner's "physical appearance combined with his weight or other factors suggest[s] malnourishment" remains in full force. (ECF #368 at 12, 16). And the SMO and the JMG have demonstrated that they takes this policy seriously, having briefly resumed involuntary enteral feedings of the petitioner when he demonstrated signs of malnutrition and having continued monitoring his weight and nutritional intake since that time. (ECF #376 at 1–2). In addition, the Court believes the Government's representation that the petitioner is fully capable of eating solid food (which he has been observed doing) and of drinking smoothies and Ensure Plus should eating prove uncomfortable. For these reasons, the Court finds the petitioner's characterization of the new SMO's medical policies and determinations as a "death sentence" to be gross hyperbole and his proffered harms to the public interest to be speculative at best. (ECF #363-1 at 19).

While the harms to the public interest that the petitioner alleges are speculative, the Court also finds that granting the petitioner's requested relief would harm the public interest by creating a perverse incentive structure. The petitioner's arguments regarding the public interest boil down to this: "Give me what I want or I'll hurt myself, maybe even kill myself, and that would

FILED UNDER SEAL
CONTAINS PROTECTED INFORMATION

~~FILED UNDER SEAL~~
~~CONTAINS PROTECTED INFORMATION~~

look bad to the rest of the world." Such threats cannot be entertained. (*C.f. Rodriguez*, 403 F.3d at 953 ("A prisoner cannot force the prison to change its rules by going on a hunger strike and blaming the prison for his resulting loss of weight. He cannot, in short, be permitted to engineer an Eighth Amendment violation.") (internal citations omitted)). Encouraging self-harm among inmates—at Guantanamo Bay or anywhere else—is not in the public interest. To do so would threaten the capacity of detention officers to maintain order. Detention officers must have flexibility to deal with situations such as the petitioner's, flexibility sufficient to balance the requirement of preserving the health of the petitioner with the need to maintain order. Subjecting the SMO and JMG's informed medical judgment to critical judicial oversight and the demands of physicians selected by detainees' lawyers does not allow for that flexibility.

Because the harms to the public interest of which the petitioner warns are speculative and improbable and because granting the petitioner's motion would be detrimental to the public interest in maintaining order and discouraging self-harm among detainees, the Court finds that this factor weighs against granting a preliminary injunction.

### Conclusion

For these reasons, the Court will deny the petitioner's motion in its entirety.

**A separate order shall issue.**

SIGNED this ___2 9th___ day of December, 2017.

HONORABLE ROYCE LAMBERTH
UNITED STATES DISTRICT JUDGE

~~FILED UNDER SEAL~~
~~CONTAINS PROTECTED INFORMATION~~

24